UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 7 2003

Michael N. Milby
Clerk of Court

| | |
|---|---|
| JUAN ZAMORA,<br>HERALIO HERNANDEZ, | |
| Plaintiffs | |
| vs. | Case No.: B-01-193 |
| DANKA OFFICE IMAGING, INC. AND<br>BRENT LONGCOR, INDIVIDUALLY AND<br>AS AGENT OF DANKA OFFICE IMAGING,<br>INC., | |
| Defendant. | |

## DEFENDANT DANKA OFFICE IMAGING COMPANY'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED FACTS

### I. MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant Danka Office Imaging Company ("Danka"), based upon the pleadings, depositions, declarations and other competent evidence on file in this record, and based upon the controlling precedent cited in the accompanying memorandum of law respectfully moves that the Court, enter an order granting summary judgment dismissing with prejudice all claims brought by Plaintiffs Juan Zamora ("Zamora") and Heralio "Lalo" Hernandez ("Hernandez"; collectively as "Plaintiffs") in the above-captioned case.

## II. STATEMENT OF UNDISPUTED FACTS

In support of its motion for summary judgment in this case, Danka submits the following statement of undisputed facts taken from the depositions of Plaintiffs and Antonio Gonzalez ("Gonzalez") and the declaration of Bob Turner ("Turner").[1]

**Plaintiffs Zamora and Hernandez**

1.      In August 2000, Danka hired Plaintiffs as sales representatives for its new Harlingen branch (Zamora at 120; Hernandez II at 18).  At that time, Zamora was 39 and Hernandez had just turned 40 (Zamora at 7; Hernandez I at 9).  Zamora and Hernandez are Mexican-American males (Zamora at 25; Hernandez II at 97, Ex. 3).

**Defendant Danka**

2.      Danka sells, leases and services office copiers and facsimile machines (Turner Dec. at ¶ 3).  Danka operated the branch at which Plaintiffs were employed from August 2000 until its closing in June 2001 (Turner Dec. at ¶¶ 4, 13).  Danka's headquarters are in Florida (Turner Dec. at ¶ 3).

**Defendant Longcor**

3.      Defendant Brent Longcor ("Longcor") was employed by Danka as sales manager of the Danka Harlingen branch until his termination in April 2001 (Turner Dec. at ¶¶ 4, 10). Longcor was based in Danka's Corpus Christi branch at the time he managed the Harlingen branch and would commute from Corpus Christi to Harlingen on a bi-weekly basis (Turner Dec. at ¶ 4).

---

[1]  These items from the record are submitted in the accompanying Appendix and are cited herein as follows: ([Deponent's last name] at __) and (Turner Dec. at ¶ __).  Danka offers the deposition testimony of Plaintiffs and Gonzalez for purposes of this summary judgment motion only and does not concede the same is true for any other purpose.

**Danka Hires Zamora and Hernandez**

4.      In summer 2000, Danka decided to open a branch in Harlingen in an effort to expand its business in the Valley area (Turner Dec at ¶ 4).  Danka assigned Longcor to hire sales representatives to staff the new office (Turner Dec at ¶ 4).

5.      Zamora learned of the opening at Danka from an ad in *The Monitor* (Zamora at 113).  At that time, Zamora had been out of work for approximately 2 months after having walked off his previous job as a route salesman for Tony's Pizza Service due to a dispute over route assignments (Zamora at 56-57).

6.      Hernandez was a sales representative with Marketing Specialists and left that job to become employed with Danka (Hernandez I at 37-38).  Hernandez stated that he did not "[s]ee a lot of opportunity [there] anymore . . ." (Hernandez I at 39).  Hernandez also responded to an ad concerning a position with Danka (Hernandez II at 20).

7.      Longcor interviewed both Zamora and Hernandez (Zamora at 114; Hernandez II at 21).  Longcor told Zamora to the effect that Danka was starting up a branch in Harlingen and that some of the Danka reps in the Corpus Christi branch were making $65,000 to $75,000 a year (Zamora at 115).  Longcor told Zamora that he would be sent by Danka to Atlanta for training (Zamora at 115).

8.      Hernandez testified that the interview "[w]ent fine . . . [t]here was nothing I saw, like, I don't want to work with this guy" (Hernandez II at 21).  Antonio Gonzalez ("Gonzalez"), also a Mexican-American hired by Danka in August 2000, likewise stated that there was nothing at all unusual about the interview (Gonzalez at 33, 35).

9.      However, Zamora claimed that Longcor "[s]tared . . ." at him during the interview (Zamora at 425).

-3-

**Initial Training by Danka**

10.     Zamora and Gonzalez were sent initially to Corpus Christi for training (Zamora at 202; Hernandez II at 24). The training there was on the office machines to be sold (Zamora at 202).

11.     Following this, the Harlingen sales representatives were sent to Atlanta for further sales training (Zamora at 214; Hernandez II at 24).

**Alleged Touching of Zamora by Longcor at "Going Away" Party**

12.     The first incident of alleged inappropriate conduct by Longcor took place at a "going away" party he threw at the end of the Corpus Christi training (Gonzalez at 47). The party took place at Longcor's house in Corpus Christi in approximately August, 2000 (Gonzalez at 47).

13.     Zamora, Hernandez and Gonzalez all rode together to the party (Gonzalez at 49). Danka Corpus Christi sales representatives were also present at the party (Gonzalez at 47).

14.     There was drinking going on at this party (Gonzalez at 48; Hernandez II at 25). Hernandez testified that Longcor made a gesture with his hands grabbing his chest and made a remark to the effect of "[b]end over bitch" (Hernandez II at 26).

a.     **Zamora's Version—Grabbing Followed by Retaliatory Swing**

15.     Zamora said that as he and Hernandez were going out the door to leave the party, he felt someone's hand touch him somewhere on his posterior (Zamora at 204). Zamora reacted by turning around and swinging, and he struck Longcor knocking him to the ground (Zamora at 206).

-4-

16.    Zamora then attempted to help Longcor up and asked Longcor if he was ok (Zamora at 305).  According to Zamora, Longcor responded he was ok and got up off the ground on his own (Zamora at 305)

17.    Following the incident, Zamora told Hernandez that "[l]ike 'He grabbed me, and I pushed him'" (Zamora at 307).  In fact, Zamora testified that **Hernandez could not have witnessed the incident because Hernandez was in front of Zamora with his back to Zamora** (Zamora at 307).

18.    Zamora said that this was the only time that Longcor touched him offensively (Zamora at 307).

### b.    Hernandez's Version—at Most an Accidental Touching?

19.    Contrary to Zamora, Hernandez denied that he and Zamora were leaving the party, but instead were walking two females Danka employees from Corpus Christi out the door (Hernandez II at 112-13). Hernandez says that he was walking towards the door with his back towards Longcor and Zamora (Hernandez II at 33, 36).  Then, Hernandez heard a noise and turned around (Hernandez II at 36).

20.    Hernandez saw Longcor on the floor, but was unable to say whether Longcor had already hit the ground or was in the process of hitting the ground (Hernandez II at 44).

21.    Hernandez says he saw Zamora attempting to help Longcor get up (Hernandez II at 36, 38).  Hernandez states that he saw Longcor's hand "[o]n [Zamora's] butt" (Hernandez at II 38-39).  Hernandez also says that he saw Zamora use "[a] quick slap, like a jerk . . .," to remove Longcor's hand (Hernandez II at 114). However, Hernandez is unable to say whether Longcor grabbed Zamora in an effort to prevent himself from falling (Hernandez II at 43).

22.    Hernandez admitted that Longcor never touched him (Hernandez II at 118). Hernandez never saw Longcor touch Zamora or any other male Danka employee other than this incident (Hernandez II at 118).

### c.    Gonzalez' Version—No Incident

23.    Gonzalez simply testified that Longcor was sitting on a stool in the middle of the room and fell off the stool (Gonzalez at 50). Gonzalez further testified that he never observed Longcor engage in any inappropriate physical contact with Zamora, or, for that matter, Hernandez (Gonzalez at 112).

24.    During the car ride back to the hotel with Gonzalez, neither Zamora nor Hernandez made any remarks about Zamora having been touched by Longcor (Gonzalez at 51). In fact, Gonzalez says that both Zamora and Hernandez were drunk when they got in the car (Gonzalez at 51).

**Zamora's Complaint in March 2001**

25.    On March 16, 2001, Zamora called Danka's Human Resources Department and reported to them "'[I] don't want to ride with [Longcor]. I don't want to do anything with this man. Get him out of here . . .'" (Zamora at 164).

**Danka's Investigation of Zamora's Complaint**

26.    Zamora testified that "Beatrice" from Danka Human Resources interviewed him to discuss his complaint (Zamora at 166). In following, Zamora wrote two letters to Danka Human Resources -- one on March 16 and one on March 19, 2001 (Zamora at 151, 166-67, Exhibit 5). Zamora testified that he wrote the second letter are March 19 in response to "Beatrice's" request for more detailed information (Zamora 166-67).

27.     Accordingly, in his March 19, 2001 letter to Beatrice Uhl at Danka, Zamora specified the following incidents:

- On November 20, 2000 -- Brent Longcor referred to me as salt and pepper hair during the 7:30-11:00 a.m. meeting. This was clearly a derogatory statement in reference to my age.[2][2]

- On December 5, 2000 -- Brent Longcor referred to me as a greedy Mexican during the 7:30-10:00 a.m. meeting. This was clearly a derogatory statement in reference to my race.

- On January 11, 2001, -- Brent Longcor referred to me as Diarrhea of the mouth during the 7:30-11:00 a.m. meeting. This was clearly a derogatory statement directed in reference to harassment.[3][3]

(Zamora at 151, Ex. 5). On March 21, 2001, Zamora received a letter from Robyn Roett in Danka Human Resources advising that Danka was going to investigate his complaint (Zamora at 180-181, Ex. 6).

28.     Zamora also claimed in his deposition that Longcor made another remark on a single occasion regarding his ethnicity to the effect "[y]ou all Mexicans . . . have siestas in the afternoon" (Zamora at 197-198). Zamora admits he omitted this from his written complaint to Danka (Zamora at 199).

29.     Hernandez was aware that Zamora had placed a complaint regarding Longcor's behavior with Danka's Human Resources Department (Hernandez II at 68-69). Hernandez was

---

[2][2] Zamora did not, and could not, bring a claim of age discrimination in this case. Indeed, at the time of the alleged harassment, Zamora was only 39 years old, and the federal Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621 – 634 and the Texas Commission on Human Rights Act ("TCHRA") as amended, Tex. Lab. Code Ann. § 21.001, *et. seq.* (Vernon 1996 & Supp. 2001) only protect employees against age discrimination who are at least 40 years of age. *See* 29 U.S.C. § 631(a) (as to ADEA); Tex. Lab. Code Ann., § 21.101 (as to TCHRA). Since neither Zamora nor Hernandez filed an EEOC charge of age discrimination and age discrimination is clearly beyond the scope of their national origin/sex and retaliation charges, such cannot be heard in this case. *See Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980) ("Allegations of new acts of discrimination [outside scope of EEOC charge], offered as the essential basis for the requested judicial review are not appropriate") (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

[3][3] In contrast to the "greedy Mexican" remark clearly labeled in the written complaint as pertaining to his race, Zamora merely wrote that the "diarrhea of the mouth" remark was "harassment" (Zamora at 151, Ex. 5). Zamora subsequently said in his deposition that it was his belief that this remark was directed at him because he was

asked by Danka Human Resources about Zamora's complaint and whether the complaint was

accurate (Hernandez II at 69).

30.    Hernandez gave the following written account to Danka:

I Lalo Hernandez want to express my thoughts on the comments that Brent
Longcor told us on several dates. On one occasion he comment [sic] greedy
Mexican to a co-worker . . . I was deeply disturb [sic]. Secondly he also mention
[sic] to the same workers salt and pepper hair and dyaric [sic] of the mouth.
Many time [sic] I feel very uncomfortable about using the word freaking as a
substitute for another word. He is always constantly degrading us humiliating and
cutting people down. If any questions call me at (956) 782 6487.

/s/

(Hernandez II at 74, Ex. 2).

31.    Hernandez admits that he had an opportunity to voice all of the complaints he had

regarding Longcor's behavior (Hernandez II at 69). Hernandez further admits that he gave

Danka's Human Resources Department all information he had at that point (Hernandez II at

70-71).

32.    Gonzalez also provided a written statement to Danka Human Resources

(Gonzalez at 55, Ex. 4). Gonzalez's statement reported the same statements allegedly made by

Longcor to Zamora regarding "salt and pepper hair," "greedy Mexican," and "diarrhea of the

mouth" on approximately the same respective dates of November 20, 2000, December 11, 2000

and January 11, 2001 (Gonzalez at 55, Ex. 4). Gonzalez also reported another remark made by

Longcor to Zamora on March 20, 2001 to the effect that Zamora was "[s]o old he used an

hibiscus [sic] instead of a calculator" Gonzalez at 55, Ex. 4).

33.    Like Hernandez, Gonzalez admitted that in his interview regarding the complaint

by Danka Human Resources, he was afforded the opportunity to tell fully of the alleged

---

speaking to a customer in Spanish (Zamora at 367). However, Gonzalez testified that he could not link the remark
to Zamora's national origin, and instead Longcor was just being "mean" (Gonzalez at 85).

harassing behavior of Longcor (Gonzalez at 60). Gonzalez told Danka everything he remembered about the alleged harassment at that time (Gonzalez at 60).

**Zamora's Admitted Knowledge of Danka's Policy Prohibiting Harassment and Procedure for Reporting Complaints of Harassment**

34.    Zamora testified that he received a Danka employee handbook at the time of his initial training in Corpus Christi (Zamora at 378). Zamora admitted he had signed an acknowledgment that he had read the entire handbook (Zamora at 378).

35.    When he reported his complaints, Zamora admitted that the way he that he knew to call Danka Human Resources and the number to call was from Danka's employee handbook (Zamora at 152).

**Gonzalez' and Hernandez' Admitted Knowledge of Danka's Harassment Policies and Complaint Procedures**

36.    Likewise, Gonzalez was familiar with Danka's policies regarding discrimination and harassment from Danka's employee handbook (Gonzalez at 44). Specifically, Gonzalez knew that if he felt as though he had encountered harassment based on sex or national origin, he was supposed to call Danka's Human Resources Department and a telephone number was provided (Gonzalez at 44-45). Gonzalez testified that he "[p]robably" received such information at beginning of his employment with Danka (Gonzalez at 45).

37.    Hernandez also testified that he had received training from Danka regarding complaining about sexual harassment and reporting it to Danka's Human Resources Department (Hernandez II at 68-69).

**Despite Familiarity with Danka's Harassment Policy, Zamora Admitted Failing to Contemporaneously Report Alleged Remarks**

-9 -

38.    Zamora admits that he never reported any of the alleged remarks to anyone at Danka until the date of his letters in March 2001 (Zamora at 159, 162, 164).

39.    Rather than report these incidents when they occurred, Zamora testified that he waited until March to report them "[b]ecause I didn't have enough evidence for him that he is doing this to me [sic]" (Zamora at 159, 164-165).  Amazingly, Zamora maintained this testimony despite the knowledge that three or four other co-workers were in the same room witnessing the same allegedly offensive remarks (Zamora at 159-160).

**Alleged Sexual Remarks by Longcor – Not Reported by Zamora until After His Termination**

40.    Zamora stated that approximately 3 times, Longcor made remarks in meetings referring to "premature ejaculations" (Zamora at 175).  On another occasion, Longcor used the expression "[y]our balls against the wall" (Zamora at 212).

41.    Zamora also claimed that frequently Longcor used the expression "blowing hot air up your ass" and Longcor would substitute the word "[f]reaking" for the obvious vulgar term of similar spelling (Zamora at 175, 212).

42.    Significantly, Zamora admitted that he did not report these alleged sexual remarks to Danka until after his termination in his June 5, 2001 letter to Danka's president (Zamora at 186, 196, Ex. 8).

43.    Similarly, Gonzalez heard Longcor make the remark on a single occasion that due to a lack of selling in the Harlingen branch, their "[b]alls were against the wall" (Gonzalez at 89).  Also, Gonzalez stated that Longcor often would use the term "freaking" (Gonzalez at 93).

44.     Gonzalez admitted that he omitted these sexual remarks from his written report to

Danka because he only wanted to include "[t]he most significant things that were bothering him"

(Gonzalez at 88).

**Danka's Investigation Results in the Immediate Removal of Longcor from Further Contact with Zamora and the Other Danka Harlingen Sales Representatives**

45.     Longcor's supervisor at Danka at that time was Regional Sales Director Bob

Turner (Turner Dec. at ¶¶ 3, 4).  Turner was advised of Zamora's harassment complaint by

Danka Human Resources (Turner Dec. at ¶ 8).

46.     Because Danka's investigation determined that Longcor had made inappropriate

remarks to Zamora and the Harlingen sales representatives, Turner immediately ordered Longcor

to return from the Harlingen branch to Corpus Christi and to have no further contact with the

Harlingen sales representatives (Turner Dec. at ¶ 9).

47.     Zamora, Hernandez and Gonzalez all clearly admit that, immediately upon

Zamora's complaint, Longcor was recalled from Harlingen and they had absolutely no further

contact -- face to face, telephonic, written or electronic -- with Longcor (Zamora at 169-170 ;

Hernandez I at 29; Gonzalez at 86-87).  Such was in keeping with the desires of Zamora and the

other Harlingen sales representatives that the alleged harassment cease (Zamora at 327;

Hernandez II at 71; Gonzalez at 86-87).   In this regard, Zamora received an April 5, 2001 letter

from Danka Human Resources advising that, following Danka's investigation of his complaint,

appropriate measures had been taken to remedy Zamora's complaint (Zamora at 182-183, Ex. 7)

48.    Upon Turner's consideration of the results of the investigation by Danka Human Resources, Longcor's employment as sales manager was terminated effective April 5, 2001 (Turner Dec. at ¶ 10).  Longcor has never supervised another Danka employee since that time (Turner Dec. at ¶ 8).

**Due to Legitimate, Non-Retaliatory Business Reasons, Danka Closes the Harlingen Branch in June 2001**

49.    Although Danka did not have high expectations for immediate profit in the new Harlingen branch, Danka did have basic goals for its performance (Turner Dec. at ¶ 6).  Danka reviewed the Harlingen branch as well as all other branches for financial viability on at least a monthly basis and without regard to any ongoing employment issues (Turner Dec. at ¶ 8).  As early as fall 2000 and early winter 2001, the sales at the Harlingen branch were performing well below Danka's expectations (Turner Dec. at ¶ 7).

50.    During the same time, Danka's financial condition was poor, and Danka was in the mode of cost reduction and closing facilities in other areas of the United States (Turner Dec. at ¶ 7).  By March 2001, it was clear to Turner that Danka had no choice other than to cut losses in the Valley and close the Harlingen branch (Turner Dec. at ¶ 8).

51.    Despite the poor sales performance of the Harlingen branch, Danka still tried to make sales in the Valley following Longcor's termination (Turner Dec. at ¶ 12).  Finally, Danka made the decision to close the branch, and, in early June 2001, Turner personally went to the Harlingen branch to advise the sales representatives of the closing and their terminations (Turner Dec. at ¶¶ 12, 13).

52.     Gonzalez candidly corroborated that Danka's Harlingen branch was not "[a]ble to compete with the market, as far as lower prices that was [sic] in the area, and we lost a lot of deals [to competitors]" (Gonzalez at 74).  Gonzalez also testified that he was aware that Danka at that time was "downsizing in their international sectors and some sections of the United States" (Gonzalez at 74).  Gonzalez acknowledged that it did not surprise him from a business perspective when Danka decided to close the Harlingen branch (Gonzalez at 76).

**Plaintiffs' Employment Is Terminated June 5, 2001**

53.     Zamora, Hernandez and the other Harlingen sales representatives were terminated effective June 5, 2001 (Zamora at 15, 186, Ex. 8; Hernandez I at 23; Gonzalez at 20).

**WHEREFORE,** based on the foregoing undisputed summary judgment record and the points and authorities cited in the accompanying memorandum of law demonstrating that there is no genuine issue as to any material fact and that Danka is entitled to judgment as a matter of law, Danka respectfully prays that the Court enter an order granting summary judgment dismissing with prejudice all of Plaintiffs' claims in the above-captioned case.

Respectfully submitted,

James M. Craig
Florida Bar No. 642096
FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133

Raymond A. Cowley
Texas Bar No. 04932400
RODRIGUEZ, COLVIN & CHANEY, LLP
4900 A-2 N. 10th Street
McAllen, TX 78504

Attorneys for Defendant Danka

-14-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **DEFENDANT DANKA OFFICE IMAGING COMPANY'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED FACTS** has been served by U.S. Certified Mail, Return Receipt Guaranteed, upon:

Mr. Juan Zamora  **[Receipt No. 7002 2410 0000 5421 8665 ]**
716 South 23rd
Donna, TX  78537-3724

Mr. Heralio Hernandez  **[Receipt No. 7002 2410 0000 5421 8658 ]**
1113 South Tower Road
Alamo, TX  78516-9473

and by U.S. First Class Mail upon:

>   Ms. Micaela Alvarez
>   Hole & Alvarez, LLP
>   P.O. Box 720547
>   McAllen, TX  78504

this 17th day of March, 2003.

Attorney

JMC/ajn

-15-