United States District Court
Southern District of Texas
FILED

MAR 1 7 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ZAMORA,
HERALIO HERNANDEZ,

        Plaintiff

vs.

DANKA OFFICE IMAGING, INC. AND
BRENT LONGCOR, INDIVIDUALLY AND
AS AGENT OF DANKA OFFICE IMAGING,
INC.,

        Defendant.

CASE NO. B-01-193

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

James M. Craig
Florida Bar No. 642096
FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133

Raymond A. Cowley
Texas Bar No. 04932400
RODRIGUEZ, COLVIN & CHANEY, LLP
4900 A-2 N. 10th Street
McAllen, TX 78504

Attorneys for Defendant Danka

## TABLE OF CONTENTS

Table of Contents                                                                                          2

Table of Citations                                                                                         3

Statement of Issues to Be Ruled upon by the Court                                                          6

Summary of Argument                                                                                        7

ARGUMENT                                                                                                    9

A.  Plaintiffs Will Fail to Come Forward with Sufficient Evidence to Establish a Prima Facie
Claim of Retaliation                                                                                       9

B.  Even If Plaintiffs Could Somehow Present a Prima Facie Case, They Will Be Unable to
Come Forward with Sufficient Evidence to Create an Issue of Fact to Show that Danka's
Legitimate Nonretaliatory Reason for Closing the Harlingen Branch Was Pretextual                          11

C.  Plaintiffs Cannot Present Sufficient Evidence to Sustain Their Harassment Claims                       12

      1.  Plaintiffs Will Fail to Show That the Alleged National Origin-Based
      Harassment Was Sufficiently Severe or Pervasive                                     12

      2. Plaintiffs' Same Sex Harassment Claims Must Be Dismissed                          13

      3. Plaintiffs Have Not Established the Elements for Sexual Harassment                 16

      4. Danka Is Entitled to the *Faragher/Ellerth* Affirmative Defense                   18

D.      Plaintiffs' Frivolous State Law Claims Must Be Dismissed                                           21

CONCLUSION                                                                                                  22

# TABLE OF CITATIONS

**Supreme Court Cases**

*Burlington Industries, Inc. v. Ellerth,*
524 U.S. 742 (1998)

*Celotex Corp. v. Catrett,*
477 U.S. 317(1986)

*Clark County School District v. Breeden,*
532 U.S. 268 (2001)

*Faragher v. City of Boca Raton,*
524 U.S. 775 (1998)

*Oncale v. Sundowner Offshore Services Inc.,*
523 U.S. 75(1998)

**Circuit Court of Appeals Cases**

*Armendariz v. Pinkerton Tobacco Co.,*
58 F.3d 144, (5th Cir. 1993)

*Barrett v. Lucent Technologies Inc.,*
2002WL1272116 (6th Cir. 2002)

*Butler v. Isleta Independent School Dist.,*
161 F.3d 263 (5th Cir. 1998)

*Casiano v. AT&T Corp.,*
213 F.3d 278 (5th Cir. 2000)

*Cooper vs. City of North Olmsted,*
795 F.2d 1265 (6th Cir. 1986)

*Hafford v. Seidner,*
183 F.3d 506 (6th Cir. 1999)

*Hughes v. Derwinski,*
967 F.2d 1168 (7th Cir 1992)

*Indest v. Freeman Decorating, Inc.,*
164 F.3d 258 (5th Cir. 1999)

*Johnson v. Hondo, Inc.*,
125 F.3d 408 (7th Cir. 1997)

*La Day v. Catalyst Technology Inc.*,
302 F.3d 474 (5th Cir. 2002)

*O'Neal v. Ferguson Construction Company*,
237 F.3d 1248 (10 Cir. 2001).

*Perez v. Region 20 Education Service Center*,
307 F.3d 318 (5th Cir. 2002)

*Ray v. Iuka Special Mun. Separate Sch. Dist.*,
51 F.3d 1246 (5th Cir. 1995)

*Richmond v. ONEOK, Inc.*,
120 F.3d 205 (10th Cir 1997)

*Sheppard v. Comptroller of Public Accounts of the State of Texas*,
168 F.3d 871 (5th Cir. 1999).

*Thornbrough v. Columbus & Greenville Railroad Co.*,
760 F.2d 633 (5th Cir.1985).

*Topalian v. Ehrman*,
954 F.2d 1125 (5th Cir.1992)

*Walker v. Sears, Roebuck and Co.*,
853 F.2d 355 (5th Cir. 1988)

**District Court Cases**

*English v. Pohanka of Chantilly, Inc.*,
190 F. Supp. 2d 833, 840 (E.D. Va. 2002)

*Hamilton v. Texas Dept. of Transportation*,
206 F. Supp. 2d 826 (S.D. Tex. 2001)

*Polly v. Houston Lighting & Power Co.*,
803 F. Supp. 1 (S.D. Tex. 1992)

*Prigmore v. Houston Pizza Ventures Inc.*,
189 F. Supp. 2d 635 (S.D. Texas 2002)

*Walton v. Johnson & Johnson Serv. Inc.*,
203 F. Supp. 2d 1312 (M.D. Fla. 2002).

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(c)

**Statement of Issues to Be Ruled upon by the Court**

The central issue before the Court is whether Danka should be granted summary judgment dismissing with prejudice all of the claims brought by Plaintiffs Juan Zamora and Heralio Hernandez.

The standard of review is that summary judgment is appropriate if no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hamilton v. Texas Dept. of Transportation*, 206 F. Supp. 2d 826, 832 (S.D. Tex. 2001)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the movant has discharged its initial burden under Rule 56, the nonmovant must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir.1992). In weighing the evidence, the court must decide all reasonable doubts and inferences in the light most favorable to the nonmovant. *See Walker v. Sears, Roebuck and Co.*, 853 F.2d 355, 358 (5th Cir. 1988); *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 640 (5th Cir. 1985).

**Summary of Argument**

In their First Amended Complaint, Plaintiffs claimed that, through the alleged actions of their supervisor, Defendant Brent Longcor ('Longcor"), Danka committed unlawful sex-based and national origin-based harassment and their termination of employment was unlawful retaliation. Plaintiffs bring these claims under in Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e - 2000e-17 and the Texas Commission on Human Rights Act ("TCHRA") as amended, Tex. Lab. Code Ann. §§ 21.001, *et. seq.* (Vernon 1996 & Supp. 2001). Plaintiffs also (impossibly) claimed that Danka violated Texas state law through intentional interference with performance of job duties, and they also seek to hold Danka vicariously liable for alleged assault and battery. Danka denies any unlawful conduct.

Plaintiffs cannot prove unlawful retaliation because there is insufficient temporal proximity between their protected activity and any adverse employment action and because the business decision that resulted in their termination was already in progress at the time of the alleged protected activity. Further, Danka had legitimate nonretaliatory reasons based on financial cost for terminating their employment to the closing of Danka's Harlingen branch.

Further, Plaintiffs will fail to show that any alleged national origin-based harassment was sufficiently severe or pervasive to state a claim under Title VII or the TCHRA. As to the alleged sex-based harassment, because the alleged harassment was same-sex, plaintiffs cannot meet the threshold for showing that Longcor's alleged conduct was actionable. With regard to all of the alleged harassment, because the alleged conduct did not culminate in a tangible job action to Plaintiffs, Danka is entitled to assert the affirmative defense under *Faragher/Ellerth* that it

exercised reasonable care to promptly prevent and correct harassing behavior and Plaintiffs unreasonably failed to take advantage of such preventive or corrective opportunities or avoid harm otherwise.

Finally, Plaintiffs' state law claims are specious. Danka cannot be held vicariously liable for an alleged sexual assault and battery because such conduct clearly would be outside the scope and course of Longcor's employment with Danka. Further, the Court has already ruled on the intentional interference with job performance claim by dismissing with prejudice such claim brought against Longcor in his "official capacity."

## ARGUMENT

### A.    Plaintiffs Will Fail to Come Forward with Sufficient Evidence to Establish a Prima Facie Claim of Retaliation

To establish a *prima facie* retaliation case Plaintiffs must prove: 1) that each engaged in protected activity; 2) that each suffered an adverse employment action; and, 3) that a causal link existed between the protected activity and the adverse employment action. *La Day v. Catalyst Technology, Inc.,* 302 F.3d 474, 483 (5th Cir. 2002); *Perez v. Region 20 Education Service Center,* 307 F.3d 318, 325 (5th Cir. 2002).

For purposes of this Motion, Danka concedes both that Plaintiffs engaged in protected activity (the March 16 2001 internal complaint about Longcor and Plaintiffs' participation in Danka's investigation thereof) and Plaintiffs suffered a subsequent adverse employment action (Danka's June 5, 2001 closure of the Harlingen branch office and their resulting terminations). Here, all Plaintiffs could hope to offer in response to this motion to support their retaliation claim is the temporal proximity between the harassment complaint and the closing of the Harlingen branch. Such is insufficient to support a prima facie case. Also, to the extent that Danka had begun the decisional process to close the Harlingen branch before, and during, the time of Zamora's March 2001 internal complaint, there can be no causal connection between the two.

The Supreme Court recently addressed the issue of temporal proximity in Title VII retaliation cases. Specifically, in *Clark County School District v. Breeden,* 532 U.S. 268 (2001), the plaintiff had filed a Title VII lawsuit against her employer, the school district, and, approximately one month later, the school district transferred the plaintiff to a different apartment. *Id.* at 271-72. Similar to the instant case, the school district had been contemplating the transfer at the time it became more aware of the plaintiff's lawsuit.

In considering the timing, the Court held:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close . . ..'" *O'Neal v. Ferguson Construction Company*, 237 F.3d 1248, 1253 (C.A.10 2001). *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992 (4-month period insufficient).

532 U.S. at 273; *see also Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (absent additional evidence, two to five months insufficient to create triable issue of causation); *Cooper vs. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months insufficient to support an inference of retaliation). Here, it is undisputed that almost three months passed between Zamora's internal harassment complaint in March 2001 and the June 2001 closing of the Harlingen branch. Plaintiffs cannot show any other evidence that would support an inference of retaliation. Accordingly, the mere temporal proximity of events in this case is insufficient as a matter of law to state a prima facie case of retaliation and Plaintiffs' retaliation claim must fail.

Moreover, the Supreme Court also held in *Breeden* that, to the extent that the school district was already contemplating the transfer of the plaintiff before it learned of the plaintiff's lawsuit, there can be no finding of causality. The Court explained "employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though the not yet definitively determined, is no evidence of whatever of causality." 532 U.S. at 272. Here, Plaintiffs cannot present any facts to dispute the evidence that Danka was aware of that as early as fall 2000 and early winter 2001, a sales performance and of the Harlingen branch was well below the expectations. Further, although the actual closing was carried out in June 2001, by March 2001 Danka already had reached the point of deciding to cut its financial losses in the Valley and close the Harlingen branch. Under the Court's holding in *Breeden*, Danka was not required to suspend the process of

closing the Harlingen branch merely because an internal complaint harassment had been made.

Thus, Plaintiffs again cannot present evidence sufficient to make a prima facie case of causation,

and, their retaliation claims must be dismissed as a matter of law.

**B.    Even If Plaintiffs Could Somehow Present a Prima Facie Case, They Will Be Unable to Come Forward with Sufficient Evidence to Create an Issue of Fact to Show that Danka's Legitimate Nonretaliatory Reason for Closing the Harlingen Branch Was Pretextual**

Moreover, this same context in which Danka made the business decision demonstrates

that Danka had a legitimate nonretaliatory reason for closing the Harlingen branch. In this

respect, if the Court finds that Plaintiffs have established a *prima facie* case, then, Danka must

articulate a legitimate nonretaliatory reason for its termination of Plaintiffs. *See Ray v. Iuka

Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1249 (5th Cir. 1995). Here, Danka has presented

indisputable evidence that the Company's financial condition was poor, the Company was in the

mode of cost reduction and closing facilities throughout the United States, and the Harlingen

branch was performing well below expectations. Thus, Danka has met its burden. *See

Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 150 (5th Cir. 1993) (in ADEA discrimination

case"[j]ob elimination or office consolidation is a sufficient nondiscriminatory reason for

discharge . . .").

To survive summary judgment, Plaintiffs must present competent evidence that Danka's

given reason was pretextual for retaliation. *Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d at

1249. This they cannot do because they will be unable to counter Danka's evidence of its

financial difficulties or of the poor financial performance of the Harlingen branch in particular.

In fact, Plaintiffs' own witness, Antonio Gonzalez, testified that Danka was unable to compete in

the Harlingen market and that he was aware that at the time of the branch closing Danka was

downsizing in other sections of the United States. Gonzalez further stated that from a business

perspective, it did not surprise him when Danka decided to close the Harlingen branch. Because

Plaintiffs cannot hope to rebut this evidence, their retaliation claims must fail as a matter of law.

**C.    Plaintiffs Cannot Present Sufficient Evidence to Sustain Their Harassment Claims**

> **1.    Plaintiffs Will Fail to Show That the Alleged National Origin-Based Harassment Was Sufficiently Severe or Pervasive**

Plaintiffs also claim that they were subjected to an event unlawful hostile work

environment based upon their Mexican-American national origin and their sex. To establish

their hostile work environment claim, Plaintiffs must prove: 1) they belong to a protected

category; 2) they were subjected to unwelcome harassment; 3) that the harassment was based on

national origin and/or sex; and 4) the harassment affected a term, condition, or privilege of

employment. *Sheppard v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871,

873 (5th Cir. 1999).

As to their claims of national origin harassment, although Danka acknowledges (for

purposes of this Motion only) that Plaintiffs are in the protected class, were subjected to alleged

unwelcome harassment by Longcor and that Longcor's comments regarding Mexican-Americans

show his conduct to be national origin-based, Plaintiffs cannot show that the alleged harassment

affected a term, condition and, or privilege of employment. To establish this last element,

Plaintiffs must prove that the harassment was sufficiently severe or pervasive. The Fifth Circuit,

in discussing the Supreme Court's holdings in *Burlington Industries, Inc. v. Ellerth*, 524 U.S.

742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), explained:

> the Court clarified the definition of 'hostile environment,' however, by noting that
> the conduct must be "severe or pervasive.' . . . The Court elaborated this in
> *Faragher*: '[I]n order to be actionable under the statute, a sexually objectionable
> environment must be both objectively and subjectively offensive, one that a
> reasonable person would find hostile or abusive, and one that the victim in fact
> did perceive to be so" . . . Whether an environment meets this standard depends
> on '"all the circumstances," including the "frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" . . ..

*Butler v. Isleta Independent School Dist.*, 161 F.3d 263, 269 (5th Cir. 1998) (quoting

*Faragher/Ellerth*; internal citations omitted). Here, although both reprehensible and in poor taste,

the only national origin-based remarks that Plaintiffs allege Longcor made were "all Mexicans . .

. have siestas in the afternoon" and the reference to Zamora as a "greedy Mexican". *See also*

*Prigmore v. Houston Pizza Ventures Inc.*, 189 F. Supp. 2d 635, 639, 642-643 (S.D. Texas 2002)

(in sexual harassment case, Court finds insufficiently severe or pervasive alleged conduct of the

plaintiff's supervisor who "tugged on the hemline of her clothing," called her flirtatious names,

told her about a $500 per night hotel room, and followed her around like a puppy"). These

remarks more resemble "mere offensive utterances" than conduct that would unreasonably

interfere with an employee's work performance, and thus are not actionable.

Moreover, Plaintiffs allege only that Longcor made these remarks on two occasions over

a period of eight months. In *Butler*, the court found that four occasional letters received by the

plaintiff at irregular intervals over two and half years gave "little or no support" to the plaintiff's

claim of a hostile work environment. 161 F.3d at 269. Plaintiffs therefore cannot sustain their

prima facie burden of showing a hostile work environment based upon their Mexican-American

national origin.

### 2.    Plaintiffs' Same Sex Harassment Claims Must Be Dismissed

Plaintiffs claim that Longcor (who is admittedly homosexual) harassed them because

they were male. The Supreme Court has recognized a cause of action based upon same-sex

harassment; however, there must be actual discrimination "because of sex" before a plaintiff may

prevail. *Oncale v. Sundowner Offshore Services Inc.*, 523 U.S. 75, 79-81(1998). There is a

significant distinction between harassment that is "sexual in content" and harassment that is

"sexually motivated," and Title VII is only concerned with "sexually motivated" harassment. *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 840 (E.D. Va. 2002) (citing *Oncale*, 523 U.S. at 80). When evaluating alleged same sex harassment the courts must consider the context in which the alleged harassment occurred "to ensure that they (courts) do not mistake male-on-male horseplay or simple teasing or roughhousing among members of the same sex for gender discrimination." *Id.* at 844.

According to the Supreme Court, the plaintiff may establish same-sex discrimination by showing that the alleged harasser made "explicit or implicit proposals of sexual activity" and the plaintiff must provide "credible evidence that the harasser was homosexual." *Oncale*, 523 U.S. at 81.[1] Moreover, "whatever evidentiary route the plaintiff chooses to follow, he or she must always prove the conduct at issue was **not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex.**" *Id.* (emphasis added). Furthermore, the Supreme Court has cautioned that "Title VII does not prohibit all verbal or physical harassment in the workplace. . . we have never held that workplace harassment is automatically discrimination. . . merely because the words used have sexual content or connotations." *Id.* at 80.

The Fifth Circuit recently held that in a same-sex harassment case courts "first must determine" as a threshold matter whether the putative harasser's conduct constitutes "discrimination because of sex" before the court considers whether the conduct meets the standards for a *quid pro quo* or hostile work environment claim. *La Day*, 302 F.3d at 478. The

---

[1] In addition to providing evidence that the alleged harasser "proposed" sexual activity, the plaintiff may alternatively establish discrimination by showing that the harasser was "motivated" by hostility toward presence of members of the same sex in the workplace or by offering comparative evidence that in a mixed -sex workplace member's of the harasser's own sex were treated differently. *Oncale,* 523 U.S. at 81. In this case, the plaintiffs have alleged only that Brent Longcor sexually harassed them by making "proposals" for sexual activity; therefore, it is unnecessary to address the alternative grounds a plaintiff may rely on to establish same-sex discrimination.

*La Day* plaintiff claimed same-sex harassment because of comments made to the plaintiff by his supervisor and because the supervisor touched a "private part" of the plaintiff's body. *Id.* at 476. The allegedly homosexual supervisor also told the plaintiff that he was "jealous" because the plaintiff had a "girl" (girlfriend). *Id.*

The *La Day* plaintiff attempted to meet his burden of establishing sex discrimination by showing that the alleged harasser made "proposals" of sexual activity. *Id.* The court held that it was necessary for the plaintiff to establish that the alleged harasser acted out of "homosexual interest" rather than out of some other motive, such as to humiliate the plaintiff. *Id.* at 480. In determining that summary judgment was inappropriate in that case, the *La Day* court held the supervisor's "statement" that he was "jealous" could be interpreted to show the supervisor had in fact "proposed" sexual activity with the plaintiff. *Id.* at 480.

In this case, Plaintiffs have failed to establish that Longcor "proposed" sexual activity. Zamora claims that Longcor touched his posterior and made a remark to the effect of "bend over bitch" at a party in August 2000 and Plaintiffs further allege that Longcor made frequent remarks about "premature ejaculations" and "blowing hot air up his shirt."

In *English*, the court granted summary judgment for an employer when an employee made a same-sex hostile work environment claim. The court granted summary judgment because the plaintiff-employee failed to demonstrate that the alleged harasser's behavior "was motivated by a earnest desire to have sex with (the plaintiff) or that his conduct was motivated by (the plaintiff's) gender rather than horseplay." 190 F. Supp. 2d at 849.

The *English* plaintiff alleged a same-sex hostile work environment occurred when the harasser told the plaintiff he "wanted to plant his salami between [plaintiff's] cheeks" and wrapped arms around the plaintiff and declared, "I'm going [to lunch] with you." *Id.* at 837.

The alleged harasser also told the plaintiff that they needed "to bond" and proceeded to "press his genitals against" the plaintiff's shoulders. *Id.* The harasser even told the plaintiff that he "loved him. . . like a stepson" and asked the plaintiff if he would like to "put his meatballs on. . .the desk." *Id.* at 838. The court recognized that the harasser's conduct was "vulgar and obnoxious," but granted summary judgment because the plaintiff failed to demonstrate that the conduct was "because of sex"; that is, the harassers "earnest" desire to have sex with the plaintiff. *Id.* at 846-849.

In reaching its decision, the court recognized that "ordinarily, sexually tinged comments are simply expressions of animosity or juvenile provocation." *Id.* at 847 (citing *Johnson v. Hondo, Inc.*, 125 F.3d 408 (7th Cir. 1997)). Even "unwelcome touching" does not necessarily amount "sexual propositioning" (including the harasser's pressing his genitals against the plaintiff's shoulders) when the "act was not followed by a proposal for sex." *Id.* at 847.

### 3. Plaintiffs Have Not Established the Elements for Sexual Harassment

If the Court finds Plaintiffs have met their burden and established that Longcor's actions were based on a homosexual interest in Plaintiffs, then summary judgment is still appropriate because Plaintiffs have not established he was subjected to "sexual harassment."[2] It is first necessary to distinguish between alleged *quid pro quo* harassment and a hostile work environment claim because an employer is entitled to assert the *Faragher/Ellerth* affirmative defense if what occurred was a hostile work environment and not *quid pro quo harassment*.[3] *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775,(1998). Because it is a threshold issue as to the *Faragher/Ellerth* defense's

---

[2]  To the extent the sporadic incidents of alleged national origin-based harassment are actionable, Danka asserts the *Faragher/Ellerth* defenses to likewise bar such claims.

[3] Of course it is Danka's position that neither *quid pro quo* harassment nor a hostile work environment occurred in this case.

applicability, the Court should first find Plaintiffs have not established that they were subjected to *quid pro quo* harassment.

To establish a claim of quid pro quo harassment the plaintiff must establish that he suffered a "tangible employment action" that "**resulted from** his acceptance or rejection of his supervisors alleged sexual harassment." *La Day*, 302 F.3d at 481 (citing *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000)) (emphasis added). A "tangible employment action" occurs when there is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

Plaintiffs presumably would claim that Danka's decision to close its office amounted to a "tangible employment action" because Danka made that decision after the alleged harassment. However, any allegation of *quid pro quo* harassment fails because it lacks the required "causal nexus." *La Day*, 302 F.3d at 482 (citing *Casiano*, 213 F.3d at 283-284); *Butler*, 161 F.3d at 268 (recognizing a causal nexus requirement between alleged harassment and any tangible employment action). Even if Danka's purely business decision to close the office was an otherwise "tangible employment action," it was not *quid pro quo* harassment because it occurred too long after the alleged harassment. *See* § A, *supra*, (as to lack of sufficient temporal nexus here to state prima facie retaliation claim).

Additionally, there cannot be *quid pro quo* harassment when the alleged harasser had no part in the decision that is alleged to be the "tangible employment action." *Walton v. Johnson & Johnson Serv. Inc.*, 203 F. Supp. 2d 1312, 1321 (M.D. Fla. 2002). Here, it is undisputed that the Longcor, the alleged harasser, had no part in the decision to close the office.

The *Walton* plaintiff alleged *quid pro quo* sexual harassment by her supervisor and the

court granted summary judgment for the employer. *Id.* The court's decision was partially based on an insufficient nexus between the tangible employment action and the alleged harassment. *Id.* Shortly after the *Walton* plaintiff complained to her employer about the harassment the employer suspended the supervisor and began an investigation (the employer later fired the supervisor). *Id.* at 1316. From the time the plaintiff complained to her employer she was kept "completely separate" in the workplace from the supervisor." *Id.* at 1317. The *Walton* parties disputed whether the plaintiff had actually been discharged; however, the court found that even if a "discharge" (tangible employment action) occurred, it certainly did not amount to *quid pro quo* sexual harassment because the discharge did not occur at the hands of the harasser. *Id.* at 1321. The court reasoned that there is no *quid pro quo* harassment unless it is the offending supervisor who uses his supervisory authority to "get the plaintiff fired or demand sex in return for a promotion." When it is the employer, absent any involvement from the offending supervisor, that terminates the employee there is no longer an opportunity for *quid pro quo* sexual harassment. *Id.*

### 4.    Danka Is Entitled to the *Faragher/Ellerth* Affirmative Defense

If the Court finds that Plaintiffs have sufficiently established a hostile work environment claim, summary judgment in favor of Danka is stil warranted because of the *Faragher/Ellerth* affirmative defense. Simply put, Danka's "prompt remedial response" to the alleged harassment "relieves it from Title VII vicarious liability." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 267 (5th Cir. 1999); *Casiano*, 213 F. 3d at 286-287.

When there is no tangible employment action that "culminates" from the alleged harassment, the employer may raise an affirmative defense to vicarious liability for its supervisor's actions when the employer has "exercised reasonable care to prevent and promptly

correct any sexually harassing behavior, and the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. The only threshold bar to Danka prevailing on the *Faragher/Ellerth* affirmative defense is if the alleged harassment "culminated" in a tangible employment action. *Ellerth*, 524 U.S. at 765. As previously discussed, the only action that is plausibly a tangible employment action is Danka's decision to close its Harlingen office. The alleged harassment here did not "culminate"[4] in that decision as that decision occurred three (3) months after any alleged harassment occurred and the closure decision was not made by the alleged harasser—Longcor. In other words, any harassment ended long before Danka made any decision that affected the terms or conditions of Plaintiffs' employment; therefore, its impossible that Longcor's supposed harassment "culminated" with Danka's decision to close the Harlingen office.

Danka is entitled to the affirmative defense because it "exercised reasonable care to prevent and promptly correct any sexually harassing behavior that may have occurred." A court "imposing vicarious liability on an employer for a supervisor's 'hostile environment' actions despite its swift and appropriate remedial response to the victim's complaint would thus undermine . . .Title VII's deterrent policy. . . (and) vicarious liability would amount to strict liability." *Indest*, 164 F.3d at 266.

The Fifth Circuit applied the *Faragher/Ellerth* affirmative defense in *Indest* and affirmed the district court's grant of summary judgment for the employer because the employer took "prompt remedial action that absolved it of liability." *Id*. at 261. The *Indest* plaintiff complained that her supervisor sexually harassed her on approximately five (5) occasions. *Id*. at 260. The

---

[4] According to *The American Heritage Dictionary*, Fourth Edition, "culminate" means to "reach the highest point or degree" or to "come to completion; end."

plaintiff reported the harassment to her employer, which investigated the complaint and disciplined the supervisor. The employer ensured the plaintiff that she would never have to work with the supervisor again, which she never did, and the harassment ceased after the employer took action against the supervisor. *Id.*

It is undisputed that Danka had a clearly communicated policy prohibiting harassment based upon national origin and/or sex and an effective procedure for receiving and investigating employee complaints of harassment. Both Plaintiffs and their witness, Gonzalez, readily admitted in their depositions that they were aware of Danka's harassment policy. In fact, Plaintiff Zamora and Gonzalez both admitted that the new that to report harassment, they were supposed to call Danka Human Resources and a telephone number was provided to them to do so.

With regard to Plaintiffs' March 2001 complaints of harassment, again, it cannot be disputed that Danka took "prompt remedial action" once it learned of such complaints. Immediately upon learning of the complaint, Danka's Regional Sales Director, Bob Turner, ordered Longcor removed from the Harlingen office and later terminated Longcor's employment as a sales manager. Plaintiffs had no further contact with Longcor whatsoever -- face-to-face, telephonic, written or electronic -- after Zamora initially complained. Instead, the harassment ceased, and Plaintiffs "received the benefit of what Title VII was meant to confer. . . prophylactic measures to deter unwanted . . . harassment." *Indest*, 164 F.3d at 265. Danka's actions relieve it from vicarious liability for Longcor's actions.

Further, Plaintiffs unreasonably failed to take advantage of Danka's strong policy and procedures concerning harassment. Zamora admitted in his deposition that he intentionally delayed bringing his harassment complaint because he wanted to gather evidence. Thus,

Plaintiffs failed to report alleged national origin-based harassment occurring as early as December 2000 and alleged sex-based harassment occurring at the August 2000 party in Corpus Christi. In fact, Zamora admitted that he himself did not report any alleged sex-based harassment by Longcor until the day of his termination in June 2001. Of course, Plaintiffs' delay in reporting the alleged conduct of Longcor is inexcusable given the availability of Danka Human Resources via telephone with whom to lodge complaints of harassment. In retrospect, Danka's swift and strong response to the complaints when eventually made demonstrates that Plaintiffs unreasonably sat on their ability to remedy any perceived harassment in their workplace. Accordingly, and primarily based upon Plaintiffs' own admissions in their deposition testimony, it is undisputed that both elements of the *Faragher/Ellerth* affirmative defense are satisfied and Plaintiffs' harassment claims must be dismissed as a matter of law.

**D.    Plaintiffs' Frivolous State Law Claims Must Be Dismissed**

Finally, Plaintiffs bring state law claims against Danka of vicarious liability for Longcor's alleged sexual assault and battery (really brought by Zamora only as to the touching incident) and for "intentional interference with performance of job duties". First, it is basic tort law in Texas that an employer is only vicariously liable for the acts of its employees that are within the scope and course of their job duties. Clearly, sexual assault and battery is outside the scope and course of an employee's job duties as it serves no purpose of, or otherwise benefits, the employer. *See, e.g. Polly v. Houston Lighting & Power Co.*, 803 F. Supp. 1, 7 (S.D. Tex. 1992). Accordingly, Plaintiffs cannot hold Danka vicariously liable for this alleged tort, and this claim must be dismissed with prejudice.

As to Plaintiffs' other state law theory, this Court has already dismissed such claim by its January 22, 2003 Order granting Defendant Longcor's Motion to Dismiss such claim.

Specifically, in its Order, the Court noted the impossibility of an agent of a corporation to interfere with that corporation's own relationship with the Plaintiffs. Accordingly, this Court dismissed Plaintiffs' tortious interference claims "[a]gainst Longcor in his official and individual capacity . . .." (January 22, 2003 Order at 4). Thus, such claims are dismissed as against Danka.

## CONCLUSION

Based on the foregoing precedent and the undisputed record in this case, Danka respectfully prays that the Court enter an order granting summary judgment and dismiss with prejudice all of Plaintiffs' claims in this case.

Respectfully submitted,

James M. Craig with permission
Raynd aCuy

James M. Craig
Florida Bar No. 642096
FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL 33602-5133
Telephone: (813) 261-7800
Facsimile: (813) 261-7899

Raymond A. Cowley
Texas Bar No. 04932400
RODRIGUEZ, COLVIN & CHANEY, LLP
4900 A-2 N. 10th Street
McAllen, TX 78504
Telephone: (956) 686-1287
Facsimile: (956) 686-6197

Attorneys for Defendant Danka

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ZAMORA,
HERALIO HERNANDEZ,

       Plaintiffs

vs.

DANKA OFFICE IMAGING, INC. AND
BRENT LONGCOR, INDIVIDUALLY AND
AS AGENT OF DANKA OFFICE IMAGING,
INC.,

       Defendant.

Case No.: B-01-193

**INDEX OF DOCUMENTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF
UNDISPUTED FACTS**

**A.    Excerpts from Deposition Transcripts Relied upon by Defendants**

    **1.**    Excerpts from Deposition Transcript of Juan Zamora, taken September 24, 2002 ("Zamora at ___").

    **2.**    Excerpts from Deposition Transcript of Heralio Hernandez, taken September 24, 2002 ("Hernandez I at ___").

    **3.**    Excerpts from Deposition Transcript of Heralio Hernandez, taken February 11, 2003 ("Hernandez II at ___").

    **4.**    Excerpts from Deposition Transcript of Antonio Gonzalez, taken September 26, 2002 ("Gonzalez at ___").

**B.    Declaration of Bob Turner**

**C.    Exhibits from Deposition of Plaintiff Relied upon by Defendants**

    **5.**    Exhibit 5 -    Letter from Zamora dated 3/19/01

    **6.**    Exhibit 6 -    Letter from Danka Human Resources dated 3/21/01

    **7.**    Exhibit 7 -    Letter from Danka Human Resources Rep dated 4/5/01

**D.**    **Exhibits from Deposition of Hernandez II Relied upon by Defendant**

    **8.**    Exhibit 2 -    Memo from Hernandez dated 3/21/01

    **9.**    Exhibit 3 -    Hernandez Charge of Discrimination

**E.**    **Exhibits from Deposition of Gonzalez Relied upon by Defendant**

    **10.**    Exhibit 4-    Letter from Gonzalez dated 3/21/01

Respectfully submitted,

James M. Craig
Florida Bar No. 642096
FORD & HARRISON LLP
101 E. Kennedy Boulevard, Suite 900
Tampa, FL  33602-5133
Telephone: (813) 261-7800
Facsimile: (813) 261-7899

Raymond A. Cowley
Texas Bar No. 04932400
RODRIGUEZ, COLVIN & CHANEY, LLP
4900 A-2 N. 10th Street
McAllen, TX  78504
Telephone: (956) 686-1287
Facsimile: (956) 686-6197

Attorneys for Defendant Danka

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Index of Documents in Support of Defendant's Motion for Summary Judgment has been served by U.S. Certified Mail upon:

> Mr. Juan Zamora
> 716 S. 23rd St.
> Donna, TX 78537

> Mr. Heralio Hernandez
> 1113 S. Tower Road
> Alamo, TX 78516-9473

this 17th day of March, 2003.

Served by U.S. First Class Mail upon:

> Micaela Alvarez
> HOLE & ALVAREZ, L.L.P.
> P.O. Box 720547
> McAllen, TX 78504

_____
Attorney

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ZAMORA AND             )(
HERALIO HERNANDEZ,          )(
        Plaintiffs          )(
                            )(
VS.                         )(    CASE NO.: B-01-193
                            )(
DANKA OFFICE IMAGING, INC.  )(
AND BRENT LONGCOR,          )(
INDIVIDUALLY AND AS AGENT   )(
OF DANKA OFFICE IMAGING,    )(
INC.,                       )(
        Defendants          )(

_____

ORAL DEPOSITION OF
JUAN J. ZAMORA
SEPTEMBER 24, 2002
VOLUME 1 OF 2        COPY

_____

        ORAL DEPOSITION OF JUAN J. ZAMORA, produced as

a witness at the instance of the DEFENDANT DANKA OFFICE

IMAGING, INC., taken in the above styled and numbered

cause on SEPTEMBER 24, 2002, reported by CORINNA N.

GARCIA, Certified Court Reporter No. 5210, in and for

the State of Texas, at the offices of Bryant &

Stingley, Inc., 2010 East Harrison, Harlingen, Texas,

pursuant to the Texas Rules of Civil Procedure.

EXHIBIT
1

09:38:41 1  if you need to take a break to talk to your attorneys

09:38:44 2  or to go to the rest room or whatever, just signal me,

09:38:46 3  and as soon as we're at a good breaking point, we'll do

09:38:50 4  that.  Is that okay?

09:38:50 5      A.  Yes.

09:38:51 6      Q.  Are you aware of any medical condition or

09:38:52 7  anything else that would prevent you from giving

09:38:56 8  truthful testimony today?

09:38:57 9      A.  No, just that I have a cold.  That's it.

09:38:59 10     Q.  Are you currently prescribed to take any

09:39:02 11 medication?

09:39:02 12     A.  No.

09:39:03 13     Q.  All right.  What is your date of birth?

09:39:09 14     A.  6/8/62.

09:39:14 15     Q.  And what's your phone number?

09:39:16 16     A.  (956) 464-7675.

09:39:24 17     Q.  Are you married?

09:39:26 18     A.  Yes.

09:39:27 19     Q.  What's your spouse's name?

09:39:28 20     A.  Diana.

09:39:33 21     Q.  And how long have you been married?

09:39:35 22     A.  18 years.

09:39:37 23     Q.  Have you ever been married to anyone else?

09:39:39 24     A.  No.

09:39:40 25     Q.  Do you have any children?

09:48:43 1    Q.   You mean any leads on employment?

09:48:45 2    A.   Any leads on employment.

09:48:47 3    Q.   Was he having any success?

09:48:48 4    A.   No.

09:49:15 5    Q.   What do you consider to be your date of

09:49:18 6    termination of employment with Danka?

09:49:24 7    A.   June 15.

09:49:28 8    Q.   15th?

09:49:29 9    A.   On or about.

09:49:29 10   Q.   And would that be 2001?

09:49:33 11   A.   I believe so.

09:49:38 12   Q.   Now, you've told me about two conversations

09:49:40 13   with Mr. Hernandez.  What I'd like to do is go forward

09:49:46 14   from June 15, 2001.  Did you have any other

09:49:50 15   conversations other than the two that you told me about

09:49:52 16   with Mr. Hernandez?

09:49:54 17   A.   No.

09:49:55 18   Q.   And, again, going forth from June 5, 2001, you

09:49:59 19   told me about one conversation you had with Mr. Torres

09:50:02 20   when you ran into him at the unemployment office.  Have

09:50:04 21   you had any other conversations other than that since

09:50:08 22   June 15, 2001?

09:50:10 23   A.   Yes.

09:50:11 24   Q.   Okay.  When was that?

09:50:12 25   A.   I would say about four months after.

25

10:02:05  1       Q.  Okay.  Well, at some point you went to the

10:02:16  2   EEOC, right?

10:02:19  3       A.  Yes, but you mentioned it.

10:02:20  4       Q.  You talked to them about your claims, right?

10:02:22  5       A.  Correct.

10:02:23  6       Q.  Have you ever been convicted of a crime?

10:02:25  7       A.  No.

10:02:26  8       Q.  Have you ever been arrested?

10:02:27  9       A.  No.

10:02:50 10       Q.  Okay.  Mr. Zamora, part of your claims against

10:02:53 11   Danka were that you were, I think you've characterized

10:02:59 12   it at one point, a victim of discrimination based on

10:03:04 13   your race.  Are you claiming that's because of your

10:03:11 14   race in being Hispanic or your national origin or both?

10:03:16 15   What exactly are you claiming?

10:03:18 16       A.  To my knowledge, EEOC told me that race and --

10:03:22 17   what was the other one?

10:03:24 18       Q.  National origin?

10:03:26 19       A.  -- national origin were totally different.  To

10:03:28 20   my understanding, they're the same.

10:03:30 21       Q.  Okay.  Well, if you were to describe yourself

10:03:35 22   in terms of race or national origin, how would you

10:03:40 23   describe yourself?

10:03:42 24       A.  Mexican American.

10:03:50 25       Q.  So you're of Mexican descent?

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

10:39:13 1    Q.  Did the addition of another route salesman to

10:39:18 2  your territory impact your income?

10:39:20 3    A.  Well, not really, because it would take a year

10:39:25 4  to regrow it again at that point.

10:39:29 5    Q.  You said something about management.  Were you

10:39:33 6  in management training at that point?

10:39:35 7    A.  No, not with Tony's.

10:39:38 8    Q.  Well, when you say it that way, were you in

10:39:40 9  management training with anybody at that point?

10:39:42 10    A.  No.

10:39:48 11    Q.  So, in your words, you said the route was cut

10:39:50 12  and you left Tony's; is that correct?

10:39:53 13    A.  Correct.

10:39:54 14    Q.  How did you advise Tony's of the fact that you

10:39:58 15  were leaving?

10:39:58 16    A.  I left, walked out.

10:40:00 17    Q.  Was this pursuant to any discussion you were

10:40:03 18  having with anybody?

10:40:04 19    A.  No.

10:40:04 20    Q.  Just one day you --

10:40:05 21    A.  I walked out.  I left the keys there and took

10:40:09 22  off.

10:40:09 23    Q.  Did you ever try to tell anybody at Tony's why

10:40:12 24  you were leaving?

10:40:13 25    A.  No.

10:40:13  1      Q.  Did anybody from Tony's try to call you and ask

10:40:16  2   you why you were leaving?

10:40:19  3      A.  If they did, I didn't answer the phone.

10:40:20  4      Q.  Do you have any knowledge either from Caller

10:40:23  5   I.D. or from --

10:40:24  6      A.  No.

10:40:25  7      Q.  -- the answering machine that somebody from

10:40:26  8   Tony's tried to call you?

10:40:29  9      A.  No, I don't have an answering machine or Caller

10:40:31 10   I.D.

10:40:32 11      Q.  Did you attempt to file for unemployment

10:40:35 12   compensation?

10:40:35 13      A.  No.

10:40:40 14      Q.  Do you know whether anybody at Tony's was aware

10:40:44 15   that you were dissatisfied with your route being cut or

10:40:46 16   the commission structure or any other dissatisfaction?

10:40:50 17      A.  No, not that I know of.  I just walked out.

10:40:58 18      Q.  Were you angry when you walked out?

10:41:01 19      A.  A little, yes.

10:41:15 20      Q.  Were you at any point subject to any kind of

10:41:19 21   employee discipline at any time you worked with Tony's?

10:41:23 22      A.  Meaning?

10:41:24 23      Q.  Did they ever write you up for anything?

10:41:26 24      A.  No.

10:41:27 25      Q.  Did you ever receive any kind of oral or

13:27:09  1    discussed?

13:27:10  2        A.  No.

13:27:27  3        Q.  How did you find out about an employment

13:27:29  4    opportunity with Danka?

13:27:31  5        A.  Newspaper.

13:27:34  6        Q.  The Monitor?

13:27:34  7        A.  Yes.

13:27:38  8        Q.  Do you remember what the ad said?

13:27:41  9        A.  No.

13:27:45 10        Q.  How did you respond to the ad?  What were you

13:27:48 11    supposed to do?

13:27:50 12        A.  Call, I believe.

13:27:51 13        Q.  Do you know who you spoke to?

13:27:55 14        A.  Brent.

13:27:57 15        Q.  What did you tell Mr. Longcor?

13:27:59 16        A.  If the position was filled.

13:28:03 17        Q.  You asked him if the position was filled?

13:28:05 18        A.  Yes.

13:28:06 19        Q.  What did Mr. Longcor tell you?

13:28:08 20        A.  He said, no, there were still openings.

13:28:15 21        Q.  What was the next step?  Did he tell you what

13:28:18 22    to do?

13:28:21 23        A.  He told me a date for the interview.

13:28:21 24        Q.  And when was that interview?

13:28:25 25        A.  I don't recall the date, but it was at the

13:28:26 1    Drury.

13:28:31 2      Q.  And you interviewed with Mr. Longcor at the

13:28:34 3    Drury at some date?

13:28:36 4      A.  Yes.

13:28:37 5      Q.  Were there other candidates for Danka

13:28:40 6    employment present at that interview session?

13:28:42 7      A.  Yes.

13:28:44 8      Q.  For example, was Mr. Ruiz there?

13:28:46 9      A.  No.

13:28:48 10     Q.  Mr. Gonzalez?

13:28:48 11     A.  No.

13:28:50 12     Q.  Mr. Hernandez?

13:28:50 13     A.  Yes.

13:28:50 14     Q.  Mr. Torres?

13:28:52 15     A.  No.

13:28:54 16     Q.  Did Danka have a branch operating in Harlingen

13:28:59 17   at the time you interviewed?

13:29:00 18     A.  I wasn't aware.  I can't answer that.

13:29:03 19     Q.  Was it your understanding that Danka was

13:29:05 20   starting up a branch in Harlingen at the time you were

13:29:09 21   interviewing with Danka?

13:29:11 22     A.  He stated something like that.

13:29:13 23     Q.  Do you have any reason to believe that's not

13:29:15 24   true?

13:29:15 25     A.  I don't remember.

13:29:19  1   Q.  And what happened during the interview?

13:29:27  2   A.  He asked me questions.  He told me that people

13:29:28  3   here -- or people were making 65 to $75,000 a year,

13:29:34  4   that's what some of the reps were doing in Corpus

13:29:38  5   already, and it sounded exciting.

13:29:46  6   Q.  Were these reps that had a lot of experience?

13:29:51  7   A.  Not all of them.

13:29:56  8   Q.  Which reps do you know were making 65 to 75 in

13:30:00  9   Corpus?

13:30:00 10   A.  I don't know.  That's what he stated.

13:30:08 11   Q.  What else did you discuss in the interview with

13:30:09 12   Mr. Longcor?

13:30:11 13   A.  Nothing.  About computer, laptop.  We were

13:30:14 14   going to get issued one laptop.

13:30:17 15   Q.  Anything else?

13:30:18 16   A.  Personal, family, background.

13:30:20 17   Q.  Did you discuss anything having to do with

13:30:23 18   training that you would receive?

13:30:24 19   A.  Yes.

13:30:25 20   Q.  What did you discuss?

13:30:27 21   A.  He said he would send us to Atlanta for

13:30:31 22   training.

13:30:37 23   Q.  At that time the sales experience that you had

13:30:41 24   had in terms of outside sales was limited to your

13:30:46 25   experience with Tony's; is that right, route sales?

13:38:41 1  first day of work?

13:38:43 2      A.  It says there on the letter.

13:38:46 3      Q.  I understand that.  I'm asking you, do you

13:38:48 4  believe that August 14, 2000 was your first day of

13:38:52 5  work?

13:38:52 6      A.  Correct, yes.

13:39:02 7      Q.  At that time what did you understand that your

13:39:05 8  duties as a sales representative or sales executive for

13:39:09 9  Danka were to be?

13:39:11 10      A.  At that point?

13:39:12 11      Q.  Yeah.

13:39:12 12      A.  December 14 that I was hired to become a

13:39:18 13  salesman.

13:39:18 14      Q.  I'm sorry?

13:39:18 15      A.  Decem -- August 14.

13:39:21 16      Q.  What I'm asking you is did you have an

13:39:22 17  understanding of what your duties would be?

13:39:24 18      A.  At that point?

13:39:25 19      Q.  Yes, on August 14.

13:39:27 20      A.  Account executive, sales executive.

13:39:29 21      Q.  What were the duties of a sales executive, as

13:39:31 22  you understood it?

13:39:33 23      A.  Sell copiers.

13:39:34 24      Q.  Is that it?

13:39:35 25      A.  Yes.

14:16:32  1    Q.  Can you give me an example?

14:16:33  2    A.  No.

14:16:34  3    Q.  You don't remember?

14:16:34  4    A.  No, I don't.

14:16:37  5    Q.  Was it a good technique?

14:16:38  6    A.  No, it wasn't that great.

14:16:46  7    Q.  Who conducted the training?

14:16:50  8    A.  Don't recall their names.

14:16:51  9    Q.  Were these sales trainers employed by Danka?

14:16:54 10    A.  I'm not sure.

14:17:02 11    Q.  And there was no other training trips that you

14:17:05 12  went on while you were employed by Danka?

14:17:09 13    A.  I don't remember.

14:17:19 14         MR. CRAIG:  Why don't we take a break.

         15         (Brief recess)

14:31:06 16    Q.  Mr. Zamora, I'm going to hand you what I'm

14:31:09 17  marking as exhibit -- I'm handing you what I've marked

14:32:01 18  as Exhibit 5 for this deposition, and ask that you --

14:32:51 19  are you able to identify the document that I've marked

14:32:54 20  as Exhibit 5?

14:32:56 21    A.  Yes.

14:32:56 22    Q.  What is Exhibit 5?

14:32:58 23    A.  They're two letters that I sent in to the human

14:33:01 24  resources.

14:33:02 25    Q.  Okay.  Let's look at the third page.  Is it

14:33:14  1    your testimony, Mr. Zamora, that you sent that third

14:33:20  2    page, which starts out "Hello, Robyn," dated March 16,

14:33:27  3    2001, that you sent that page to somebody on March 16,

14:33:31  4    2001?

14:33:33  5        A.   Yes.

14:33:34  6        Q.   Yes?

14:33:35  7        A.   I sent it to somebody, yes.

14:33:38  8        Q.   Who is Robyn?

14:33:40  9        A.   I don't know, somebody from human resources.

14:33:42 10    That's the name they gave me.

14:33:44 11        Q.   Who gave you that name?

14:33:45 12        A.   When I called to -- I believe I called the

14:33:54 13    office in Virginia -- I mean, in Florida, and they gave

14:33:54 14    me that name from human resources.

14:33:57 15        Q.   How did you know to call the office in Florida?

14:34:00 16        A.   Because that's in your handbook.

14:34:03 17        Q.   It's something in the handbook?  And was that

14:34:07 18    part of the handbook that told you if you felt like you

14:34:11 19    were the victim of discrimination or harassment you

14:34:14 20    should call a certain number?

14:34:16 21        A.   Correct.

14:34:17 22        Q.   So they gave you Robyn -- do you remember her

14:34:19 23    last name as being maybe Roett?

14:34:22 24        A.   I'm not sure.

14:34:23 25        Q.   Anyway, it was somebody named Robyn, correct?

14:40:28  1    A.  To me at that time it looked like it was

14:40:32  2  degrading me as far as, not my age, but my look, or

14:40:37  3  whatever.  I don't know what -- apparently my age, my

14:40:38  4  appearance.  It could have been my appearance.

14:40:39  5    Q.  The only comment you list on your two

14:40:42  6  complaints on March 16 and March 19 is "salt and pepper

14:40:44  7  hair."  So what about someone saying something about

14:40:48  8  salt and pepper hair, Mr. Longcor saying that to you,

14:40:52  9  made you feel it was derogatory?

14:40:55 10    A.  In the way he said it, "What makes you think

14:40:57 11  that your salt and pepper hair is going to sell, or

14:41:00 12  you're going to sell that copier?  What makes you

14:41:02 13  think?"  That's what he said.

14:41:04 14    Q.  How come you didn't write that quote as exactly

14:41:08 15  as you've just told me in this letter?

14:41:09 16    A.  I didn't know you had to be specific when you

14:41:13 17  sent it to human resources.

14:41:15 18    Q.  Okay.  Did you tell Mr. Longcor you found that

14:41:21 19  offensive?

14:41:23 20    A.  No, because he chuckled, "Ha, ha."  Why would I

14:41:26 21  want to tell him right then and there when it

14:41:29 22  embarrassed me with everybody there, in front of the

14:41:36 23  people.

14:41:39 24    Q.  Did anybody else react when that statement was

14:41:41 25  made?

14:41:42 1    A.  Yes.

14:41:42 2    Q.  Who did?

14:41:43 3    A.  Everybody.  They looked at each other.  We all

14:41:46 4  looked at each other.  We didn't chuckle or laugh.

14:41:51 5    Q.  Was there any other reaction?

14:41:53 6    A.  No, we just looked at each other.

14:41:56 7    Q.  Did you ask to be excused from the room?

14:41:59 8    A.  No.

14:42:02 9    Q.  Did you and any of the other individuals that

14:42:05 10  were there that day discuss that statement after it was

14:42:09 11  made?

14:42:09 12    A.  Yes.

14:42:12 13    Q.  What did you discuss?

14:42:12 14    A.  The remark he said, "Did I mishear what he

14:42:18 15  said?"  And they said, "No, I heard it."

14:42:21 16    Q.  Did it make you angry?

14:42:22 17    A.  Yes.

14:42:29 18    Q.  Okay.  And you're quite positive that you

14:42:40 19  didn't misinterpret what he said?

14:42:43 20    A.  No, not after he chuckled.

14:42:48 21    Q.  And until March 16, 2001, you didn't tell

14:43:00 22  anybody at Danka about that statement, did you?

14:43:03 23    A.  No, because I didn't have enough evidence for

14:43:05 24  him that he is doing this to me.

14:43:08 25    Q.  You had four other people in the room, or three

14:43:12 1    other people in the room that all heard the same thing.

14:43:15 2        A.  Correct.

14:43:16 3        Q.  And you still didn't feel like you had enough

14:43:19 4    evidence to make a report?

14:43:23 5        A.  No.

14:43:23 6        Q.  And then on December 5, 2000, that incident,

14:43:24 7    you said, "Mr. Longcor referred to me as a 'greedy

14:43:28 8    Mexican' during the 7:30 to 10:00 a.m. meeting."  It

14:43:32 9    uses 10:00 a.m. again.

14:43:33 10       A.  On or about, that I remember.

14:43:35 11       Q.  Okay.  Was it -- how did he refer to you as a

14:43:43 12   "greedy Mexican"?  You seem like there was more detail

14:43:46 13   as the last one.  Do you have any more detail as to

14:43:47 14   this one?

14:43:48 15       A.  He asked me, "Give me your proposal."  I gave

14:43:50 16   him my proposal.  I went to get something.  By the time

14:43:52 17   I came back, he said -- I was walking in the door and

14:43:53 18   he goes, "You greedy Mexican."  And he chuckled.

14:43:57 19   That's the way he did it.

14:44:00 20       Q.  How did -- what kind of proposal was it?

14:44:02 21       A.  A copier.  I don't know.  I can't recall the

14:44:05 22   particular one.

14:44:06 23       Q.  And when during this span of 7:30 to 10:00 a.m.

14:44:11 24   was it?

14:44:11 25       A.  Excuse me?  Again.

14:45:13 1    A.  We looked at each other the same way when the

14:45:16 2  salt and pepper.  We looked at each other.

14:45:21 3    Q.  The other individuals in the room that were

14:45:22 4  witnesses were also Mexican American, correct?

14:45:24 5    A.  Correct.

14:45:28 6    Q.  Did you believe that they were offended by it?

14:45:31 7    A.  I don't know about them.  I know I was.

14:45:34 8    Q.  Did you and the other people that heard the

14:45:37 9  remark discuss it afterwards?

14:45:40 10    A.  Yes.

14:45:52 11    Q.  And as with the "salt and pepper" remark, you

14:45:56 12  didn't report it to anyone at Danka until March 16,

14:45:59 13  2001; is that correct?

14:46:02 14    A.  Correct.

14:46:05 15    Q.  And then on January 11, again, I assume on or

14:46:09 16  about, there was a statement during the meeting

14:46:13 17  "diarrhea the mouth" during the 7:30 to 11:00 a.m.

14:46:17 18  meeting.  Can you give me the context of that?

14:46:24 19    A.  Same thing.  I believe that previous day we had

14:46:25 20  gone cold calling and I was with a Mexican or a

14:46:28 21  Hispanic customer, and we were talking.  I don't know

14:46:32 22  why he meant that, but he goes, "You diarrhea the

14:46:36 23  mouth, ha, ha, ha" again.

14:46:38 24    Q.  You mean chuckled again?

14:46:40 25    A.  Yes.

14:47:58  1    Q.  Were you afraid of Mr. Longcor?

14:48:00  2    A.  Yes.

14:48:02  3    Q.  Because of this remark?

14:48:03  4    A.  Not that, all of them.

14:48:06  5    Q.  Well, there were three here, "salt and pepper

14:48:09  6   hair," "greedy Mexican," and "diarrhea of the mouth."

14:48:12  7    A.  Yeah, and there were more.

14:48:17  8    Q.  And you didn't report the "diarrhea of the

14:48:20  9   mouth" remark to Danka until March 16, 2001, did you?

14:48:25 10    A.  No.

14:48:26 11    Q.  And when you said -- when you didn't report the

14:48:31 12   a "greedy Mexican" remark, is that, again, because you

14:48:34 13   desired to gather more evidence before you made --

14:48:37 14    A.  I thought it was going to stop.  It never did.

14:48:39 15    Q.  Did you ask him to stop?

14:48:41 16    A.  Would I?  I don't know.  I was distracted and

14:48:44 17   scared.

14:48:45 18    Q.  But you never --

14:48:46 19    A.  The last day that I talked to human resources I

14:48:49 20   told them, "I don't want to ride with this man.  I

14:48:52 21   don't want to do anything with this man.  Get him out

14:48:55 22   of here."  Somebody called him and called him back.

14:48:59 23    Q.  That's March 16, 2001?

14:49:02 24    A.  I have no idea what day it was.  I can't

14:49:04 25   remember.

14:49:04 1      Q.  Okay.  And when you didn't report the "diarrhea

14:49:07 2   of the mouth remark," you, again, were gathering

14:49:09 3   evidence?

14:49:10 4      A.  Yes.

14:49:14 5      Q.  So after you had an opportunity to gather

14:49:19 6   evidence on March 16, you mentioned three specific

14:49:24 7   remarks on three separate days; is that correct?

14:49:28 8      A.  Three separate days of what?

14:49:30 9      Q.  Look at the third page of Exhibit 3.

14:49:33 10     A.  Okay.  At that time I was scared writing the

14:49:36 11  damn letter.  I can't remember the actual on or about

14:49:40 12  date.  But I did write it down.

14:49:44 13     Q.  You only mentioned three remarks.

14:49:46 14     A.  Okay.

14:49:46 15     Q.  Okay.  Then three days later you mentioned the

14:49:50 16  exact same remarks; is that right?

14:49:53 17     A.  Right.

14:50:08 18     Q.  After you were -- made your report to both

14:50:13 19  Beatrice and Robyn, what contact did you have from

14:50:19 20  Danka in response to your complaint?

14:50:22 21     A.  From what time to what time?

14:50:25 22     Q.  Well, if I understand you right, after you

14:50:27 23  wrote the March 16 fax or e-mail, Robyn told you about

14:50:30 24  somebody named Beatrice?

14:50:32 25     A.  Yes.

14:50:32  1          Q.  And then you sent a letter to Beatrice on the

14:50:35  2    19th, correct?

14:50:36  3          A.  Correct.

14:50:37  4          Q.  Did someone respond to you from Danka?  Did

14:50:41  5    Beatrice respond to you after you sent this letter?

14:50:44  6          A.  I believe it was Beatrice.  The day that

14:50:45  7    Mr. Longcor called me from Harlingen to ride with me,

14:50:48  8    and I told that -- I believe it was Beatrice, I'm not

14:50:51  9    sure, "I don't want to ride with the man, and I don't

14:50:54 10    want to deal with it."  And that's when they called

14:50:57 11    him.  She even called me back, "We're not going to let

14:50:58 12    him.  We're going to call him to go close a deal in

14:51:01 13    Corpus.  So don't worry about it."

14:51:04 14          Q.  So you didn't have to ride with Mr. Longcor?

14:51:07 15          A.  No.

14:51:09 16          Q.  And that was in response to your direction to

14:51:11 17    Beatrice that you didn't want to ride with him,

         18    correct?

14:51:13 19          A.  Correct.

14:51:15 20          Q.  Did somebody ever interview you to discuss with

14:51:18 21    you your complaint?

14:51:21 22          A.  Yes, when I wrote this letter first, she told

14:51:24 23    me, "Do it a little bit more into detail," and that's

14:51:27 24    when I wrote this.

14:51:29 25          Q.  Okay.  So the letter on March 19 is designed to

14:51:32 1  provide more detail than the March 16 letter; is that

14:51:35 2  correct?

14:51:35 3      A.  Not into detail.  More information.

14:51:38 4      Q.  Okay.  Okay.  After you sent the March 19

14:51:46 5  letter to Beatrice, did someone ask you about the

14:51:50 6  things that you accused Mr. Longcor of in that letter?

14:51:54 7      A.  Yes.

14:51:55 8      Q.  Who?

14:51:56 9      A.  I don't know who it was.  I can't recall the

14:51:58 10  name.  I know it had to be human resources.

14:52:06 11     Q.  Was it on the telephone or in person?

14:52:07 12     A.  Telephone.

14:52:07 13     Q.  Was it a man or a woman?

14:52:10 14     A.  I can't remember.

14:52:13 15     Q.  What did you tell that man or woman?

14:52:22 16     A.  I told them everything that had happened.

14:52:25 17     Q.  Okay.  You told them about the "salt and

14:52:28 18  pepper," the "greedy Mexican," and the "diarrhea the

14:52:31 19  mouth" remarks?

14:52:34 20     A.  Yes.

14:52:34 21     Q.  Did you mention any other remarks?

14:52:35 22     A.  Not that I remember.  I can't remember at this

14:52:39 23  time, but I know I had mentioned something about sexual

14:52:42 24  harassment.

14:52:44 25     Q.  Okay.  And what did you mention about sexual

14:54:15 1    March of 2001.  Do you remember that?

14:54:18 2        A.  Uh-huh.

14:54:18 3        Q.  Are you saying that Mr. Longcor was still your

14:54:21 4    supervisor at the time that Mr. Turner came to you and

14:54:24 5    told you that the branch was being closed?

14:54:27 6        A.  Mr. --

14:54:28 7            MS. TAYLOR:  Objection,

14:54:29 8    mischaracterization of evidence.

14:54:33 9        Q.  That's fine.  Go ahead and answer.

14:54:34 10       A.  I refuse to answer.  Mr. Turner came in, and he

14:54:44 11   told us that he was not in his position no longer.

14:54:52 12       Q.  Okay.  And that was the same time he told you

14:54:53 13   that the branch was closed?

14:54:56 14       A.  That he was closing the office down.  "Guys, I

14:55:00 15   have" -- when he came in he said, "Guys, this is not a

14:55:03 16   lovely sight" or something, "This is not a good visit.

14:55:08 17   We're coming here to close the office down."

14:55:10 18       Q.  And is that -- did he present you with the

14:55:12 19   letters that offered you a separation package?

14:55:15 20       A.  No, that one that we had to sign and give our

14:55:18 21   laptops and get everything in, a checklist.

14:55:22 22       Q.  Okay.  So you don't recall a point where

14:55:35 23   Mr. Longcor was no longer your branch manager when you

14:55:37 24   were still working with Danka?

14:55:40 25       A.  From the time of the 16 to the day he let go,

14:55:43 1   no.

14:55:45 2        Q.   So you had to work with Mr. Longcor in, say,

14:55:49 3   April 2001?

14:55:54 4        A.   I'm not sure.  I know March he was not here.

14:55:57 5        Q.   Right.

14:56:00 6        A.   Right.

14:56:00 7        Q.   Well, let me ask you this.  When you asked

14:56:03 8   Beatrice and told her that you didn't want to ride with

14:56:05 9   Mr. Longcor and you say that they redirected him to

14:56:09 10  make a sale, did you ever have to work with Mr. Longcor

14:56:13 11  again at that point?

14:56:15 12       A.   No.

14:56:16 13       Q.   Did you see -- had you seen Mr. Longcor -- from

14:56:19 14  the time that you told Beatrice you didn't want to ride

14:56:22 15  with him, have you seen him until this day today?

14:56:27 16       A.   No.

14:56:28 17       Q.   Have you spoken to Mr. Longcor at any time

14:56:31 18  since you've asked Ms. Beatrice not to ride with him?

14:56:37 19       A.   No.

14:56:38 20       Q.   Have you received any letters or e-mails from

14:56:40 21  Mr. Longcor since the time you asked Beatrice to not

14:56:44 22  ride with him anymore?

14:56:46 23       A.   No.

14:56:54 24       Q.   Do you know whether Danka took any disciplinary

14:56:59 25  action towards Mr. Longcor after you complained?

15:02:29 1    individuals?

15:02:29 2        A.  No.

15:02:31 3        Q.  Or have you ever seen -- what other

15:02:42 4    criticism --

15:02:44 5        A.  Who?

15:02:44 6        Q.  -- did Mr. Longcor give to you that made it

15:02:48 7    hard for you to do your job?

15:02:53 8        A.  That was -- right now my mind went blank just

15:02:55 9    by thinking what he had done.

15:02:57 10       Q.  Did he make the "premature ejaculation" remark

15:03:01 11   more than once?

15:03:02 12       A.  Yes.

15:03:02 13       Q.  How often?

15:03:06 14       A.  No more than three probably.

15:03:08 15       Q.  Three times?

15:03:10 16       A.  More or less, yes.

15:03:10 17       Q.  And how many times did he make the remark about

15:03:14 18   "blowing hot air up your ass"?

15:03:17 19       A.  Every time.

15:03:17 20       Q.  Every day?

15:03:19 21       A.  Well, not every day, but as usually he was

15:03:21 22   here.

15:03:22 23       Q.  Every day that he was in the branch he would

15:03:25 24   make the remark about "blowing hot air"?

15:03:28 25       A.  Yes.

15:08:17 1   asked Beatrice not to ride with Mr. Longcor and you

15:08:22 2   never saw him again until today and you never heard

15:08:25 3   from him again until today, you never received any

15:08:29 4   correspondence from him until today, that it wasn't

15:08:32 5   until after she granted your request not to ride with

15:08:36 6   him that you found out he was gay, right?

15:08:38 7      A.   He was -- all I know is he was gay, yes, when

15:08:42 8   she said it.

15:08:43 9      Q.   When she said it?

15:08:44 10     A.   When she told me he's not going to ride with me

15:08:48 11  no longer, I did not know he was gay yet.

15:08:50 12     Q.   You found out from Mr. Ruiz after that?

15:08:54 13     A.   Right.

15:10:15 14     Q.   I'm going to hand you what I'm marking as

15:10:17 15  Exhibit 6.

15:11:34 16         MS. TAYLOR:   I'm going to object to

15:11:36 17  Exhibit 6, hearsay.

15:11:37 18     Q.   Okay.   You ready?

15:12:48 19     A.   Yes.

15:12:48 20     Q.   Are you able to identify the document I've

15:12:50 21  handed you marked as Exhibit 6?

15:12:53 22     A.   Yes.

15:12:54 23     Q.   What is Exhibit 6?

15:12:55 24     A.   It's the letter that Danka sent me back where

15:12:58 25  they were going to do an investigation.

15:13:00 1    Q.  Okay.  Did you receive that letter?

15:13:01 2    A.  Yes.

15:13:04 3    Q.  After you received that letter, did you ever

15:13:06 4  have occasion to call Robyn at the (615) 783-2293

15:13:13 5  number that's listed there?

15:13:16 6    A.  Did I have to call them?

15:13:18 7    Q.  Did you ever call her?

15:13:20 8    A.  I don't remember.

15:13:25 9    Q.  Did you speak to somebody after you received

15:13:27 10  that letter about your allegations against Mr. Longcor?

15:13:33 11    A.  Don't remember.

15:13:35 12    Q.  Do you know whether any of your coworkers were

15:13:40 13  contacted by human resources concerning the things that

15:13:44 14  you were complaining of?

15:13:46 15    A.  I don't know.

15:13:47 16    Q.  You don't know?

15:13:48 17    A.  I don't know if they called them.

15:13:52 18    Q.  Do you know whether any of your coworkers gave

15:13:54 19  written statements from March 2001 to Danka regarding

15:13:59 20  your allegations?

15:14:00 21    A.  Yes.

15:14:02 22    Q.  Who did?

15:14:03 23    A.  All of -- Torres, Lalo, Tony, Joe Ruiz.

15:14:10 24    Q.  Did you ever read those statements at any

15:14:14 25  point?

15:14:14 1    A.  Not until I took them to Ms. -- my attorney.

15:14:22 2    Q.  How did you get them before you took them to

15:14:24 3  your attorney?

15:14:25 4    A.  They wrote them.

15:14:26 5    Q.  When did they write them?

15:14:27 6    A.  I don't remember.  They dated it.

15:14:32 7    Q.  Well, were they written in March 2001, or were

15:14:34 8  they written later?

15:14:36 9    A.  I don't know.  Probably in 2001.

15:14:41 10    Q.  Probably?

15:14:43 11    A.  Yeah, because I'm not sure.  I don't have the

15:14:45 12  documents.

15:14:45 13    Q.  You didn't -- those statements weren't written

15:14:49 14  after you were employed by Danka, were they?

15:14:53 15        MS. TAYLOR:  Objection.

15:14:53 16    A.  I don't remember.

15:15:05 17    Q.  Okay.  I'm going to hand you a document that's

15:15:16 18  been marked as Exhibit 7.

15:15:35 19        MS. TAYLOR:  We're going to object on this

15:15:36 20  as hearsay to Exhibit 7.

15:16:27 21    Q.  Ready?  We need you to signal me when you're

15:16:32 22  ready.

15:16:32 23    A.  Yes.

15:16:33 24    Q.  Are you able to identify the document marked as

15:16:36 25  Exhibit 7?

15:16:37 1      A.   Yes.

15:16:37 2      Q.   What is that document?

15:16:38 3      A.   That's the letter that Danka sent back after

15:16:40 4  the investigation.

15:16:42 5      Q.   Okay.  Do you remember receiving that letter?

15:16:45 6      A.   Yes, sir.

15:16:47 7      Q.   So when you read it, it said, "Please be

15:16:51 8  advised that appropriate measures have been taken to

15:16:54 9  remedy the issues that were brought to our attention."

15:16:57 10  Did you have any understanding what those appropriate

15:16:59 11  measures were?

15:17:04 12     A.   No, I told them to give me a document what --

15:17:06 13  to notify me what course of action they were going to

15:17:09 14  take, a specific.

15:17:10 15     Q.   All right.  And at that time you're saying you

15:17:13 16  had no idea that Brent Longcor was no longer your

15:17:17 17  supervisor?

15:17:17 18     A.   I didn't know.

15:17:17 19     Q.   Was it kind of strange that he disappeared at

15:17:23 20  that point?  You didn't talk to him, you didn't see

15:17:24 21  him.

15:17:25 22     A.   Correct.

15:17:25 23     Q.   You didn't think that was strange?

15:17:28 24     A.   But what was the appropriate measure?

15:17:32 25     Q.   Were you being harassed by Mr. Longcor by the

15:19:36  1        A.  I don't know.

15:20:32  2        Q.  Did you -- just to clarify one thing, did you

15:20:37  3    discuss or did you meet with either Mr. Hernandez,

15:20:39  4    Mr. Ruiz, Mr. Torres, or Mr. Gonzalez to get your

15:20:45  5    stories together in terms of the written complaints

15:20:45  6    that you submitted to Danka in March -- or the written

15:20:49  7    statement you submitted to Danka in March of 2001?

15:20:53  8        A.  Not that I'm aware of, because whatever they

15:20:55  9    saw in that meeting, everybody heard it.

15:20:56 10        Q.  And everybody had the exact date in mind as to

15:21:00 11    when those incidents occurred?

15:21:01 12        A.  I don't know because I haven't looked at it, as

15:21:04 13    far as going back, "Oh, you forgot this."  I'm not

15:21:07 14    going to do that.

15:21:08 15        Q.  Okay.  So you're saying that none of you got

15:21:14 16    around maybe a calendar and tried to determine what

15:21:19 17    date --

15:21:20 18        A.  No.

15:21:20 19        Q.  -- any of these incidents occurred?

15:21:22 20        A.  Not that I remember.

15:22:26 21        Q.  After -- take a look at Exhibit 5, please.  And

15:22:44 22    then I'm going to hand you another exhibit, which I've

15:22:47 23    marked as Exhibit 8.  And, again, signal me when you've

15:22:51 24    had a chance to review it.

15:23:15 25        A.  Go ahead.

15:56:43  1     A.   No.

15:56:45  2     Q.   Now, at the time that you made your report in

15:56:55  3   March 2001, which is reflected in Exhibit 5, you're

15:57:02  4   saying that there were sexual comments or behavior on

15:57:08  5   the part of Mr. Longcor that occurred, but you just did

15:57:12  6   not include them in the writing that is Exhibit 5?

15:57:16  7     A.   Correct, because I was embarrassed.

15:57:22  8     Q.   Did you tell anybody at Danka in March 2001,

15:57:23  9   when they were investigating your complaint that was

15:57:28 10   Exhibit 5, did you tell anyone at Danka about sexual

15:57:32 11   remarks or sexual behavior?

15:57:35 12     A.   Tell verbally or written like this?

15:57:37 13     Q.   Verbally or written.

15:57:38 14     A.   This.

15:57:38 15     Q.   But before then.  Before then.  Let's ask it

15:57:42 16   that way.  Before you wrote Exhibit 8, did you tell

15:57:45 17   anyone at Danka about any kind of sexual harassment or

15:57:50 18   sex-based behavior on the part of Mr. Longcor towards

15:57:53 19   you?

15:57:54 20     A.   No, only on June 5.

15:57:57 21     Q.   Are you aware of whether anyone else, any of

15:57:59 22   Mr. Hernandez -- I mean, Mr. Gonzalez, Mr. Hernandez,

15:58:03 23   Mr. Ruiz, or Mr. Torres, told anyone at Danka about

15:58:07 24   sexual behavior by Mr. Longcor before the date of

15:58:12 25   Exhibit 8?

15:58:13 1    A.  I'm not aware.

15:58:22 2    Q.  In Exhibit 5, the first remark about "salt and

15:58:26 3  pepper hair" you said you perceived to be having to do

15:58:31 4  with your age.  Sitting here today, can you tell me

15:58:34 5  about any other remarks or behavior that Mr. Longcor

15:58:38 6  engaged in towards you that you believe related to your

15:58:42 7  age?

15:58:43 8    A.  My mind went blank as far as any other ones.

15:58:48 9    Q.  So he never made any remarks to you about being

15:58:51 10 too old or anything along those lines that refer to

15:58:55 11 your age that you can recall here today other than the

15:58:57 12 salt and pepper hair?

15:58:58 13   A.  I don't remember.

15:58:59 14        MS. TAYLOR:  Objection, misstatement of

15:59:00 15 evidence.

15:59:02 16   Q.  You don't?

15:59:03 17   A.  Don't remember.

15:59:04 18   Q.  Okay.  And can you tell me whether there were

15:59:10 19 any other remarks other than the remark that you

15:59:15 20 mentioned in Exhibit 5 about being a greedy Mexican

15:59:19 21 that related to your national origin, race, the fact

15:59:23 22 that you're Mexican American made by Mr. Longcor while

15:59:27 23 you were employed by Danka?

15:59:33 24   A.  "You have siestas in the afternoon," meaning

15:59:35 25 being lazy.

15:59:35  1     Q.   He made a statement to you about that?

15:59:36  2     A.   Yes.

15:59:36  3     Q.   Who was having siestas in the afternoon, did he

15:59:39  4     say?

15:59:39  5     A.   "You all Mexicans."

15:59:41  6     Q.   Was he talking about you all in the sales

15:59:42  7     force, or was he talking about just Mexicans in

15:59:45  8     general?

15:59:45  9     A.   I took it upon everybody.

15:59:46 10     Q.   And when did he make this remark?

15:59:49 11     A.   In a meeting.

15:59:49 12     Q.   Which meeting?

15:59:51 13     A.   One that he held.

15:59:52 14     Q.   Was it -- let's use the Exhibit 5 as a

15:59:58 15     reference.  I think it's right below that one,

16:00:03 16     Mr. Zamora.  You have the November remark, the December

16:00:09 17     remark, and the January remark.  With those as a time

16:00:12 18     reference, can you say whether it was before or in

16:00:16 19     between or after any of those particular ones?

16:00:23 20     A.   I don't remember because he made remarks.  I

16:00:23 21     don't recall exact date.

16:00:25 22     Q.   Are you saying he made the siesta remark more

16:00:28 23     than once?

16:00:28 24     A.   No, he mentioned it once.

16:00:29 25     Q.   Okay.  But you just can't remember where it

16:00:32 1    falls in this chronology?

16:00:34 2        A.  Right, right.

16:00:34 3        Q.  Is there any reason why you didn't include that

16:00:36 4    in Exhibit 5?

16:00:38 5        A.  Because I didn't know Ms. Beatrice wanted

16:00:40 6    every -- the book.  I had a lot of them.

16:00:46 7        Q.  Well, let me see if I understand.  You did want

16:00:50 8    to report in Exhibit 5 at least the remarks that you

16:00:55 9    felt were age-related or related to your race or

16:01:01 10   national origin or in reference to harassment, but you

16:01:04 11   were embarrassed to bring anything up having to do with

16:01:08 12   sexual harassment?

16:01:10 13       A.  Right.

16:01:10 14       Q.  Is that correct?

16:01:11 15       A.  I was embarrassed, yes.

16:01:16 16       Q.  Did you ever keep any kind of contemporaneous

16:01:19 17   notes of any alleged harassment that Mr. Longcor

16:01:24 18   allegedly made towards you, other than your written

16:01:27 19   complaint?

16:01:28 20       A.  I don't remember.  I can't -- my mind went

16:01:32 21   blank.

16:01:32 22       Q.  Did you ever keep any kind of diary of any of

16:01:34 23   this treatment?

16:01:35 24       A.  No, not diary.

16:01:42 25       Q.  When Mr. Longcor made this remark about having

16:03:47 1      Q.   Can you name them for me?

16:03:54 2      A.   No.  I don't recall.  I don't recall their

16:03:58 3   names particularly.

16:04:00 4      Q.   Did you make a special trip to Corpus Christi

16:04:02 5   for this party?

16:04:03 6      A.   No, we were there.

16:04:04 7      Q.   For what?

16:04:05 8      A.   When we got hired for training.

16:04:07 9      Q.   Okay.  What were you being trained in?

16:04:10 10     A.   On machines, equipment.

16:04:12 11     Q.   You're talking about the copiers themselves?

16:04:14 12     A.   Copiers, the fax machines, yes.

16:04:17 13     Q.   How long were you in Corpus for?

16:04:19 14     A.   I'm not sure.  Probably a week.

16:04:21 15     Q.   How did you find out about the party?

16:04:22 16     A.   He invited us.

16:04:24 17     Q.   In writing?

16:04:25 18     A.   Verbally.

16:04:29 19     Q.   What did he tell you?

16:04:29 20     A.   "We're going to have a party at my house for

16:04:31 21   the new hires" and I guess for sales.  I don't know.

16:04:36 22     Q.   Was there anybody at that party other than

16:04:39 23   Danka employees, to your knowledge?

16:04:42 24     A.   No.

16:04:42 25     Q.   What time of day was the party?

16:04:46 1     A.  Between 6:00 and 12:00, 6:00 and 1:00 in the

16:04:50 2  morning.

16:04:50 3     Q.  In the morning?

16:04:52 4     A.  Yes.

16:04:52 5     Q.  You're talking about 1:00 in the morning?

16:04:54 6     A.  6:00 in the afternoon to 1:00 in the morning.

16:04:58 7     Q.  Okay.  Did you have your own transportation

16:04:59 8  there?

16:04:59 9     A.  Yes.

16:05:02 10     Q.  Was it your car?

16:05:04 11     A.  One car.

16:05:04 12     Q.  Whose car?

16:05:04 13     A.  I'm not sure.

16:05:05 14     Q.  Was it a rental car?

16:05:07 15     A.  No, because we took our individual cars.

16:05:09 16     Q.  But to the party --

16:05:11 17     A.  I don't recall which car.

16:05:14 18     Q.  You don't recall who drove?

16:05:15 19     A.  No.

16:05:19 20     Q.  And where did Mr. -- where were you located

16:05:23 21  when Mr. Longcor touched you?

16:05:27 22     A.  Going out.

16:05:27 23     Q.  Going out where?

16:05:28 24     A.  Going out the door.

16:05:30 25     Q.  Front door, back door?

16:05:32 1      A.  Front door.

16:05:33 2      Q.  Was this leaving the party?

16:05:34 3      A.  Yes.

16:05:36 4      Q.  This is at the end of the time that you were

16:05:38 5  spending at the party, you were walking out the front

16:05:40 6  door, and he touches you in the rear?

16:05:43 7      A.  Correct.

16:05:44 8      Q.  Okay.  Did anybody else see it, that you know

16:05:48 9  of?

16:05:48 10     A.  I don't know.

16:05:55 11     Q.  Okay.  How exactly did he touch you?

16:06:00 12     A.  He -- I don't know because I felt something

16:06:02 13 from behind, and I went like this, and Mr. Longcor

16:06:08 14 fell, and I kept walking.

16:06:11 15     Q.  Okay.  So did he touch -- did he touch your

16:06:15 16 right buttock, your left buttock?

16:06:18 17     A.  I don't know.  I know he grabbed me right in

16:06:25 18 between.

16:06:25 19     Q.  You say "grabbed me."  Squeezed?

16:06:25 20     A.  No, he went like this.

16:06:25 21     Q.  You mean touched?

16:06:27 22     A.  Right.

16:06:27 23     Q.  Just one time, one touch?

16:06:29 24     A.  One time.

16:06:29 25     Q.  Okay.

| | |
|---|---|
| 16:06:31 1 | MS. ALVAREZ: And, just for the record, I |
| 16:06:32 2 | think plaintiff reached over and touched his attorney |
| 16:06:36 3 | at the time. |
| 16:06:38 4 | MS. CONNET: But on the back. |
| 16:06:38 5 | Q. You're trying to show how hard, right? |
| 16:06:42 6 | A. Yeah, how, more or less. |
| 16:06:44 7 | Q. Did he clasp his hand, or did he just with an |
| 16:06:48 8 | open hand touch you? How exactly did he touch you? |
| 16:06:52 9 | Could you tell? |
| 16:06:53 10 | A. No, I couldn't tell. |
| 16:06:54 11 | Q. And you're saying it was right in the middle of |
| 16:06:56 12 | your buttocks? |
| 16:06:58 13 | A. Around the vicinity. |
| 16:07:00 14 | Q. Did any of it touch your genitals? |
| 16:07:04 15 | A. Close when he went down. |
| 16:07:05 16 | Q. I hate to do this, but how close? |
| 16:07:08 17 | A. Around between five inches all the way around. |
| 16:07:12 18 | Q. Well, you know -- |
| 16:07:16 19 | A. I'm not sure. |
| 16:07:24 20 | Q. Did his hand touch through the fabric your |
| 16:07:27 21 | genitals or not? |
| 16:07:29 22 | A. Through the fabric? |
| 16:07:30 23 | Q. Yeah. |
| 16:07:31 24 | A. I felt it way down there. I don't know if he |
| 16:07:34 25 | did hit it. |

16:07:36 1    Q.  He did or he didn't?

16:07:40 2    A.  It was close enough.

16:07:41 3    Q.  Was it close enough to cause pain?

16:07:44 4    A.  No.

16:07:49 5    Q.  And you're saying that when you felt this, you

16:07:52 6  turned around, and did you throw an elbow?

16:07:56 7    A.  Like this.

16:07:56 8    Q.  You threw the back of your hand, back of your

16:07:58 9  fist?

16:07:58 10   A.  No, swing.

16:08:00 11   Q.  And you hit Mr. Longcor?

16:08:01 12   A.  Yes, he fell.

16:08:03 13   Q.  But you felt yourself hit Mr. Longcor, correct?

16:08:07 14   A.  By that time, probably I did.  Because when I

16:08:10 15  went -- turned like that, he was falling on the floor.

16:08:13 16   Q.  So he was still in the house?

16:08:15 17   A.  Yes.

16:08:17 18   Q.  Were you on the step?

16:08:17 19   A.  No, close to the door.

16:08:19 20   Q.  So you weren't quite out the door yet?

16:08:21 21   A.  No.

16:08:22 22   Q.  Were you out the door at that point?

16:08:25 23   A.  No.

16:08:26 24   Q.  Okay.  So you're standing in the house.  Were

16:08:31 25  you in the doorway?

16:09:28  1   was swinging.  When I saw you swing, he fell."  That's
16:09:31  2   what he said.
16:09:33  3       Q.  Did you say anything at that point?
16:09:36  4       A.  I told him he had grabbed me or touched me.
16:09:40  5       Q.  Did you guys speculate at that point as to why
16:09:43  6   Mr. Longcor grabbed you?
16:09:44  7       A.  Why?  I don't know.  I don't know his
16:09:47  8   intentions.
16:09:49  9       Q.  Did you ever mention it to Mr. Longcor again?
16:09:52 10       A.  No, because we went to Atlanta and I tried to
16:09:56 11   tense back.
16:10:01 12       Q.  Did you ever report that touch to the law
16:10:05 13   enforcement authorities?
16:10:07 14       A.  No, I didn't.  I was embarrassed.
16:10:25 15       Q.  And that's the only time that Mr. Longcor
16:10:27 16   touched you, correct?
16:10:29 17       A.  That I remember, yes.
16:10:29 18       Q.  And the reason you didn't include that in
16:10:31 19   Exhibit 5 was because you were embarrassed?
16:10:34 20       A.  Correct.  But prior to that he also went like
16:10:44 21   this, "You bitch."
16:10:46 22       Q.  To who?
16:10:47 23       A.  We were three standing there, Lalo, Joe, and
16:10:50 24   Tony.
16:10:51 25       Q.  Same party?

16:10:51  1        A.   Yes.

16:10:52  2        Q.   All right.   He was touching his own breasts?

16:10:56  3        A.   Yes.

16:10:56  4        Q.   And you were making a gesture where he was

16:11:00  5   going up and down rubbing both breasts and said, "You

16:11:03  6   bitch."

16:11:04  7        A.   Yes.

16:11:04  8        Q.   Do you know why he said that?

16:11:06  9        A.   No.

16:11:06 10        Q.   Was it in response to anything someone said?

16:11:10 11        A.   Probably we were discussing something and, I

16:11:12 12   don't know, he just came out and said, "Oh, you bitch."

16:11:16 13        Q.   And --

16:11:16 14        A.   I don't recall the conversation.

16:11:18 15        Q.   Did that offend you?

16:11:19 16        A.   Yes.

16:11:19 17        Q.   And why did that offend you?

16:11:22 18        A.   Isn't it like sexual, for being done wrong in

16:11:26 19   public?

16:11:27 20        Q.   You tell me.

16:11:29 21        A.   It is.

16:11:29 22        Q.   Did you take it as sexual?

16:11:31 23        A.   Yes, it is.

16:11:38 24        Q.   Okay.   Did you tell Mr. Longcor at that point,

16:11:39 25   "Please don't say things like that in front of me

16:11:43 1    anymore?"

16:11:43 2       A.  No, sir.

16:11:43 3       Q.  Did you indicate your disapproval of that

16:11:45 4    gesture?

16:11:46 5       A.  No, I just turned.  I just turned, no.

16:11:51 6       Q.  Do you think Mr. Longcor was in any way acting

16:11:56 7    in gest or kidding around when he did that?

16:12:00 8       A.  I don't know.  I don't know what his intention

16:12:02 9    was.

16:12:03 10       Q.  Well, do you think he was seriously calling

16:12:06 11    someone a bitch?

16:12:08 12       A.  Out loud?

16:12:09 13       Q.  Yeah.

16:12:10 14       A.  Yes, he would.

16:12:12 15       Q.  Who was he calling a bitch?

16:12:16 16       A.  Whoever listened.  He was viewing me when he

16:12:19 17    said it.  I don't know if he said it to me or somebody

16:12:22 18    else, but I got offended off of that.

16:12:26 19       Q.  Okay.  What other things of a sexual nature did

16:12:29 20    Mr. Longcor do while you were employed at Danka, to

16:12:34 21    you?

16:12:35 22       A.  I don't remember.

16:12:36 23       Q.  You don't remember?

16:12:36 24       A.  No, I don't remember any more.

16:12:38 25       Q.  Did he make any statements?

16:13:50 1    A.  It did.  What I meant by it didn't affect me,

16:13:51 2  it affected me just by the word itself.

16:13:53 3    Q.  "Freaking"?

16:13:54 4    A.  "Freaking," yes.  Because there is no such

16:13:57 5  thing in the dictionary as "freaking."

16:14:04 6    Q.  I'm not sure I understand, Mr. Zamora.  How did

16:14:07 7  it offend you based on the fact that you're a man?

16:14:11 8    A.  Sexual.

16:14:13 9    Q.  Yeah, sexually?

16:14:13 10    A.  By the word "fucking," by "freaking."

16:14:15 11    Q.  But he didn't say "fucking."  He said

16:14:16 12  "freaking."

16:14:16 13    A.  It meant that.  You just clean it up.  Just

16:14:19 14  because the way you phrase it is different.

16:14:22 15    Q.  In what context would he use that word?

16:14:25 16    A.  "That freaking customer doesn't know what the

16:14:28 17  hell he's doing" because he doesn't want to buy a

16:14:31 18  copier.

16:14:40 19    Q.  Did you take his using that word, "freaking,"

16:14:43 20  as any kind of sexual advance towards you?

16:14:47 21    A.  No, but the word itself, it offended me, prior

16:14:50 22  to all of what was going on.

16:14:54 23    Q.  Okay.  Did you also ever hear Mr. Longcor use

16:14:58 24  an expression about to the effect of "balls to the

16:15:02 25  wall" or something like that?

16:15:59  1    Q.  Did it have anything to do with the sales --

16:16:01  2    A.  Yes.

16:16:01  3    Q.  -- performance?

16:16:02  4    A.  Correct.  And he also mentioned, "Whatever you

16:16:04  5    learned in Atlanta, here you're going to do it my way

16:16:08  6    or the highway."

16:16:09  7    Q.  Okay.  Did you ever report before March 2001 to

16:16:20  8    anyone that he was deviating from the Atlanta training?

16:16:27  9    A.  Yes.

16:16:31 10    Q.  Who did you report to before March that he was

16:16:35 11    deviating?

16:16:36 12    A.  My letter.

16:16:37 13    Q.  I'm talking about before.

16:16:38 14    A.  No.

16:16:46 15    Q.  And what did he tell you to do differently from

16:16:47 16    the SPIN selling technique that you were taught in

16:16:51 17    Atlanta?

16:16:52 18    A.  In Atlanta they told us it was going to take a

16:16:55 19    year because you are on a base, new accounts, it's

16:16:55 20    going to take you a year to learn.  And by the time you

16:16:58 21    start accumulating a lot of accounts, you will start

16:17:01 22    gradually getting referrals and stuff like that.  And

16:17:05 23    Atlanta told us, "Don't worry about it, guys.  Hang in

16:17:09 24    there for a year and you'll be successful."

16:17:12 25    Mr. Longcor said, "No, your balls against the wall."

1

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

3  JUAN ZAMORA AND                )(
   HERALIO HERNANDEZ,             )(
4         Plaintiffs             )(
                                  )(
5  VS.                            )(   CASE NO.: B-01-193
                                  )(
6  DANKA OFFICE IMAGING, INC.     )(
   AND BRENT LONGCOR,             )(
7  INDIVIDUALLY AND AS AGENT      )(
   OF DANKA OFFICE IMAGING,       )(
8  INC.,                          )(
         Defendants              )(

9

10                    REPORTER'S CERTIFICATE

11         I, CORINNA N. GARCIA, Certified Court
Reporter, certify that the witness, JUAN J. ZAMORA, was
12  duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
13  SEPTEMBER 24, 2002; that the deposition was reported by
me in stenograph and was subsequently transcribed under
14  my supervision.
         I FURTHER CERTIFY that I am not a
15  relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
16  counsel, nor am I financially interested in the action.
         WITNESS MY HAND on this the **23ʳᵈ** day of
17  _January_____, 2003.

18                        _Corinna N. Garcia_____
                          CORINNA N. GARCIA, CSR NO. 5210
19                        Expiration Date: 12/31/03
                          Bryant & Stingley, Inc.
20                        2010 East Harrison
                          Harlingen, Texas  78550
                          (956) 428-0755

21

22

23

24

25

03/17/2003 12:55 FAX 8132617899    FORD & HARRISON LLP                    ☑006
Case 1:01-cv-00193    Document 33    Filed in TXSD on 03/17/2003    Page 70 of 153

305

| | | |
|---|---|---|
| 10:05:40 | 1 | Q.  Who did you see? |
| 10:05:40 | 2 | A.  I did. |
| 10:05:42 | 3 | Q.  You helped him up? |
| 10:05:42 | 4 | A.  I turned around and said, "You okay?"  And I |
| 10:05:44 | 5 | just left. |
| 10:05:45 | 6 | Q.  Okay.  After you're saying he grabbed you and |
| 10:05:48 | 7 | you knocked him over, then you turned around and said |
| 10:05:51 | 8 | "Are you okay"? |
| 10:05:52 | 9 | A.  Yes, yes. |
| 10:05:53 | 10 | Q.  And what did he answer? |
| 10:05:54 | 11 | A.  "Yes," that's what he said. |
| 10:05:56 | 12 | Q.  And you left him there on the floor? |
| 10:05:59 | 13 | A.  Yes, he was getting up on his own. |
| 10:06:00 | 14 | Q.  Okay.  And Mr. Hernandez, he's standing right |
| 10:06:03 | 15 | there in front? |
| 10:06:04 | 16 | A.  No, he was out close to the door. |
| 10:06:06 | 17 | Q.  Okay.  And did he see this exchange between you |
| 10:06:09 | 18 | and Mr. Longcor? |
| 10:06:10 | 19 | A.  Yes. |
| 10:06:10 | 20 | Q.  And Mr. Hernandez at that time didn't say |
| 10:06:12 | 21 | anything about "Why is he on the floor?" or "What |
| 10:06:15 | 22 | happened?" |
| 10:06:16 | 23 | A.  Yes. |
| 10:06:16 | 24 | Q.  He did say that?  Okay.  What did -- |
| 10:06:18 | 25 | A.  Not there. |

10:07:07  1    Mr. Hernandez?

10:07:10  2        A.   That he had grabbed me.

10:07:11  3        Q.   Okay.  Did you describe any more detail than

10:07:13  4    "He grabbed me"?

10:07:14  5        A.   No, I didn't tell him anything.  Like "He

10:07:20  6    grabbed me, and I pushed him."  That was it.

10:07:22  7        Q.   That was all you told him?

10:07:23  8        A.   Yes.

10:07:23  9        Q.   Okay.  And he didn't witness it, obviously,

10:07:26 10    because he was in front of you with his back to you,

10:07:29 11    right?

10:07:29 12        A.   Correct.

10:07:29 13        Q.   Okay.  So, according to your testimony, the

10:07:30 14    only two people that witnessed it would be yourself,

10:07:33 15    even though it was, you know, something that happened

10:07:34 16    behind you, and Mr. Longcor, right?

10:07:37 17        A.   Right.

10:07:38 18        Q.   Okay.  And that was the one and only time that

10:07:43 19    Mr. Longcor has ever touched you in a manner that you

10:07:47 20    find to be offensive; is that right?

10:07:50 21        A.   That I know of, yes.

10:07:51 22        Q.   Certainly you would know, Mr. Hernandez.

10:07:52 23        A.   What do you mean?

10:07:53 24        Q.   You would know if you had been touched in a

10:07:56 25    manner that you found to be offensive.

10:43:43 1  that it's not tolerated by your company, okay?

10:43:47 2      Q.  So then my earlier question was correct, you

10:43:50 3  wanted them to fire him, didn't you?

10:43:51 4      A.  For his actions?  For his actions?

10:43:53 5      Q.  Mr. Zamora, again, I get to ask you the

10:43:57 6  questions.  You don't get to ask me the questions.

10:43:57 7  When you complained to Danka in March of 2001, the

10:44:03 8  outcome you were desiring was for Danka to fire

10:44:07 9  Mr. Longcor, correct?

10:44:09 10     A.  No, because my mind wasn't in the right place.

10:44:11 11 I don't know what I was thinking when I told them.  I

10:44:14 12 wasn't thinking of firing him.  I don't know if I did

10:44:20 13 or not.  I can't say that.  My mind wasn't there.

10:44:20 14     Q.  So in March of 2001 when you complained to

10:44:23 15 Danka, was it your desire simply that the actions that

10:44:26 16 you were complaining of that you say were being taken

10:44:30 17 against you, that you not have to go through that

10:44:33 18 anymore; is that right?

10:44:36 19     A.  Correct.

10:44:37 20     Q.  Okay.  And how they handled it, you know, at

10:44:42 21 that point in time, you really had no specific

10:44:44 22 objective.  So long as it didn't happen to you anymore,

10:44:48 23 that's what you were seeking, right?

10:44:50 24     A.  I wanted to find out what would happen.

10:44:53 25     Q.  Mr. Zamora --

10:44:54 1      A.   Send a letter.

10:44:55 2                MR. CRAIG:   Objection, move to strike,

10:44:57 3      nonresponsive.

10:44:58 4                MS. ALVAREZ:   I will join in that

10:44:59 5      objection as nonresponsive.

10:45:01 6      Q.   Mr. Zamora, the question was, in March of 2001

10:45:03 7      when you complained to Danka, if I'm understanding you

10:45:06 8      correctly, you're telling me, "No, at that time I

10:45:09 9      didn't necessarily want them to fire him.  What I

10:45:12 10     wanted was I didn't want to have to go through this

10:45:13 11     anymore," right?

10:45:14 12     A.   Yes.

10:45:14 13     Q.   Okay.  And you didn't go through that anymore

10:45:16 14     after you complained to Danka in March of 2001, right?

10:45:19 15     A.   Yes.

10:45:19 16     Q.   So what you wanted actually happened, right?

10:45:22 17     A.   Yes.

10:45:23 18     Q.   Okay.  Now, Mr. Zamora, you understand you had

10:45:35 19     filed a lawsuit against Mr. -- Danka and Mr. Longcor,

10:45:39 20     right?

10:45:39 21     A.   Yes.

10:45:39 22     Q.   I mean, that's why we're here today, right?

10:45:41 23     A.   Yes.

10:45:42 24     Q.   Okay.  And as part of your complaint, you

10:45:49 25     allege that you have been damaged, right?

03/17/2003 12:56 FAX 8132617899     FORD & HARRISON LLP                    ☐008
Case 1:01-cv-00193    Document 33    Filed in TXSD on 03/17/2003    Page 74 of 153

367

11:44:30  1    point he did not say "diarrhea of the mouth."  He said

11:44:34  2    it in a meeting at that point.

11:44:36  3        Q.  What did he say when you were speaking Spanish

11:44:40  4    at the time that you were speaking Spanish and he

11:44:42  5    walked in?

11:44:44  6        A.  But it was at the office when he called me

11:44:46  7    "diarrhea of the mouth."

11:44:48  8        Q.  But what did he say -- listen to the question.

11:44:52  9    What did he say at that time that you were cold calling

11:44:54 10    and speaking Spanish, if anything, he said?

11:44:59 11        A.  I don't remember on that one.

11:45:00 12        Q.  That's fine.  And when he referred to the

11:45:04 13    "diarrhea of the mouth" at the meeting, what was he

11:45:06 14    referring to?

11:45:08 15            MR. CRAIG:  Object to form.

11:45:10 16        Q.  Why did Mr. --

11:45:12 17        A.  Because of the way we speak.

11:45:15 18            MR. CRAIG:  New question?

11:45:16 19            MS. ALVAREZ:  Yes, it is.

11:45:17 20        Q.  Why did Mr. Longcor state the phrase or say in

11:45:21 21    the meeting "diarrhea of the mouth"?

11:45:25 22            MR. CRAIG:  Same objection to form.

11:45:28 23            MS. ALVAREZ:  Speculation.

11:45:28 24        Q.  If you know.  Why did -- let me just rephrase

11:45:31 25    the whole question.  If you know, why do you believe

14:22:33 1    Q.  In the period of time following your March 2001

14:22:39 2  complaint, you never e-mailed anybody at Danka and

14:22:42 3  asked for support in sales or training; isn't that

14:22:47 4  right?

14:22:48 5    A.  Don't remember.

14:23:31 6    Q.  You testified that you believe that Mr. Longcor

14:23:37 7  wanted to do something with you.  Do you remember

14:23:40 8  testifying to that?

14:23:46 9    A.  Doing to me?  Like what do you mean?  Rephrase

14:23:49 10  it.

14:23:50 11    Q.  I think I pretty faithfully quoted you.  Did

14:23:53 12  you believe that Mr. Longcor wanted to do something

14:23:57 13  sexual with you?

14:24:00 14    A.  It felt like the way he was acting, yeah.

14:24:07 15    Q.  All the time when you worked with him?

14:24:09 16    A.  Yes.

14:24:18 17    Q.  You also said that Mr. Longcor stared at you

14:24:27 18  during your job interview.  Do I have that right?

14:24:30 19    A.  Stared?

14:24:31 20    Q.  Yeah.

14:24:32 21    A.  Yeah, he went like this.  The same, yeah, "How

14:24:35 22  are you doing, Johnny?"  Yes.

14:24:37 23    Q.  So you just kind of leaned back and looked sort

14:24:40 24  of down your face.  And how did you take that?

14:24:45 25    A.  Nothing, because I never known the man.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ZAMORA AND            )(
HERALIO HERNANDEZ,         )(
          Plaintiffs       )(
                           )(
VS.                        )(   CASE NO.: B-01-193
                           )(
DANKA OFFICE IMAGING, INC. )(
AND BRENT LONGCOR,         )(
INDIVIDUALLY AND AS AGENT  )(
OF DANKA OFFICE IMAGING,   )(
INC.,                      )(
          Defendants       )(

---

ORAL DEPOSITION OF
HERALIO HERNANDEZ
SEPTEMBER 25, 2002    COPY



---

     ORAL DEPOSITION OF HERALIO HERNANDEZ, produced

as a witness at the instance of the DEFENDANT DANKA

OFFICE IMAGING, INC., taken in the above styled and

numbered cause on SEPTEMBER 25, 2002, reported by

CORINNA N. GARCIA, Certified Court Reporter No. 5210,

in and for the State of Texas, at the offices of Bryant

& Stingley, Inc., 2010 East Harrison, Harlingen, Texas,

pursuant to the Texas Rules of Civil Procedure.

EXHIBIT
2

15:13:03 1    A.  664-7822.

15:13:09 2    Q.  Okay.  I'm going to get some background

15:13:12 3  information from you.  What is your date of birth?

15:13:15 4    A.  6/2/61.

15:13:18 5    Q.  So you just turned 41, correct?

15:13:22 6    A.  (Moving head up and down)

15:13:22 7    Q.  Where were you born?

15:13:25 8    A.  San Juan, Texas.

15:13:31 9    Q.  Again, forgive me, is that in this area in the

15:13:34 10  Valley?

15:13:34 11    A.  Yes, right here.

15:13:35 12    Q.  Have you always lived in the Valley?

15:13:38 13    A.  Practically all my life, yes.

15:13:41 14    Q.  Was -- I believe you were in the Service,

15:13:46 15  right?

15:13:46 16    A.  Right.

15:13:46 17    Q.  Was that the only time you didn't live in the

15:13:46 18  Valley?

15:13:48 19    A.  Right.  That's about it.

15:13:51 20    Q.  Have you ever been married?

15:13:53 21    A.  Yes, sir.

15:13:55 22    Q.  Were you married more than once?

15:13:57 23    A.  Yes, sir.

15:13:57 24    Q.  Let's talk about your first marriage.  What is

15:14:00 25  the name of your first wife?

15:29:41 1      A.  I -- as soon as the -- I considered it as soon
15:29:45 2  as I told them and they removed him.  That, to me, was
15:29:53 3  like I was terminated because I didn't get -- I mean,
15:29:57 4  they removed him, but, yet, they didn't come back and
15:30:00 5  tell me, "Okay.  You know what, let's start again," no
15:30:03 6  guidance, no support, no demos, no nothing.
15:30:07 7      Q.  Okay.  Let me ask you this.  If you considered
15:30:09 8  yourself to be terminated at that point, did you start
15:30:11 9  looking for a job then?
15:30:13 10     A.  No.  I mean, you're hoping.  You're hoping that
15:30:15 11 things are going to -- you know, maybe the next week
15:30:19 12 they're going to come and tell you, "Hey, guys, we
15:30:20 13 apologize for this behavior" or whatever.
15:30:24 14     Q.  Was there a point in time, Mr. Hernandez,
15:30:25 15 though, when you were told, for lack of a better way to
15:30:29 16 put it, officially your employment was terminated by
15:30:33 17 Danka?
15:30:33 18     A.  Yes.
15:30:34 19     Q.  Do you know what date it was?
15:30:36 20     A.  I believe it was June 5th.
15:30:40 21     Q.  Let me try and help you.  You think it was
15:30:43 22 2001?
15:30:43 23     A.  Yeah, 2001.
15:30:49 24     Q.  Since June the 5th, 2001, other than your
15:30:53 25 attorneys, have you discussed your claims against Danka

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755     (956)542-1020

15:37:38  1        Q.  Prior to seeing him today, when is the last
15:37:40  2   time you saw Mr. Longcor?
15:37:43  3        A.  I would say March, about March 9th.
15:37:48  4        Q.  Of 2001?
15:37:50  5        A.  2001.
15:37:51  6        Q.  And that's about the time that you made --
15:37:54  7   Danka HR interviewed you about complaints of
15:37:57  8   harassment?
15:37:58  9        A.  Exactly.
15:37:58 10        Q.  And prior to -- I don't even know if you know,
15:38:05 11   but prior to today when is the last time you spoke to
15:38:08 12   Mr. Longcor either on the phone or face to face?
15:38:11 13        A.  Never.
15:38:12 14        Q.  Going back to March 9?
15:38:13 15        A.  After March 9, after he was moved to Houston, I
15:38:18 16   have never talked to him.
15:38:18 17        Q.  And have you received an e-mail from
15:38:21 18   Mr. Longcor since March of 2001?
15:38:24 19        A.  No.
15:38:27 20        Q.  Have you received any kind of written
15:38:29 21   correspondence or communication from Mr. Longcor since
15:38:32 22   March 2001?
15:38:33 23        A.  No.
15:38:40 24        Q.  Okay.  After the Navy, what was your first job?
15:38:45 25        A.  I went back to what I used to do before.  It

15:47:08  1      Q.   Did they get purchased by somebody?

15:47:10  2      A.   I believe there was a -- they went bankrupt,

15:47:12  3   and I don't know who took them over.  You know all the

15:47:18  4   laws that there is about bankruptcy.  I don't know.

15:47:21  5      Q.   So that gets us -- you started with Marketing

15:47:24  6   Specialists roughly in '87?

15:47:26  7      A.   January -- I remember January '88.

15:47:30  8      Q.   Okay.  What type of position did you have with

15:47:34  9   them?

15:47:34 10      A.   It was just a sales rep.

15:47:39 11      Q.   Selling what line or lines?

15:47:41 12      A.   It was Gatorade, Reynolds Foil, Kellogg's,

15:47:47 13   various amount of companies.

15:47:49 14      Q.   Is this, again, sort of a brokerage?

15:47:52 15      A.   Right.

15:47:58 16      Q.   And was part of your market retail grocery

15:48:01 17   stores?

15:48:02 18      A.   Right.

15:48:05 19      Q.   Did you also have, I guess, smaller retail

15:48:10 20   Quick Mart kind of things?

15:48:11 21      A.   Not convenience stores.  Not convenience

15:48:15 22   stores, but small retail stores to mid-size to your

15:48:20 23   large size.

15:48:21 24      Q.   Was that in the -- was your territory -- well,

15:48:26 25   what was your territory in January '88?

15:48:29 1    A.    From Brownsville to McAllen.

15:48:33 2    Q.    So that's almost the entire Valley?

15:48:36 3    A.    Kind of, yeah.

15:48:39 4    Q.    Did your position change with Marketing

15:48:42 5    Specialists?

15:48:43 6    A.    It was a good company to work for.  Towards the

15:48:46 7    end they were restructuring.  I saw, you know, their --

15:48:53 8    less opportunity in sales and stuff like that.  So

15:48:57 9    that's when I kind of came aboard after 12 years to

15:49:02 10   Danka.

15:49:03 11   Q.    Okay.  So the next employer was Danka?

15:49:06 12   A.    Danka, right.

15:49:13 13   Q.    And you left --

15:49:12 14   A.    Marketing Specialists and I gave them my --

15:49:14 15   Q.    Let me finish.  I'd love for you to take over

15:49:13 16   for me right now, but I guess I've got to ask the

15:49:23 17   questions to get answers.

15:49:22 18   A.    Sure.

15:49:22 19   Q.    You left Marketing Specialists on good terms?

15:49:25 20   A.    Yes, sir.

15:49:25 21   Q.    Did you leave Marketing Specialists for the

15:49:27 22   specific purpose of taking a job with Danka?

15:49:31 23   A.    Yes, sir.

15:49:33 24   Q.    Who was your last immediate supervisor at

15:49:36 25   Marketing Specialists?

03/17/2003 12:59 FAX 8132617899       FORD & HARRISON LLP                    ☑013
Case 1:01-cv-00193    Document 33    Filed in TXSD on 03/17/2003    Page 82 of 153

39

15:49:38  1        A.   JoAnn Rosales.

15:49:43  2        Q.   And when you left Marketing Specialists, were

15:49:46  3    you still a sales representative?

15:49:48  4        A.   No, they were changing to sales exec, but also

15:49:54  5    being that H-E-B was the main, you know, baby here,

15:50:01  6    they were having more resets in the stores.  So it was

15:50:04  7    not -- I didn't see a lot of opportunity anymore,

15:50:07  8    salesmen/reset team.

15:50:09  9        Q.   Was this in any way route sales?

15:50:12  10       A.   No.

15:50:12  11       Q.   No?

15:50:13  12       A.   No, you would sell out of your sheets and the

15:50:19  13   wholesaler would ship them in.

15:50:19  14       Q.   Would you come in and merchandise in the

15:50:20  15   stores?

15:50:20  16       A.   Yeah, a little bit of the merchandise, a little

15:50:23  17   bit of everything.  But then it was more resets for

15:50:27  18   H-E-B, more resets.  So I didn't see much opportunity.

15:50:36  19            MR. CRAIG:  This is as good a breaking

15:50:38  20   point as any, Counsel.  We kind of went through

15:50:41  21   employment history and got up to Danka and we can go

15:50:45  22   other places, but, I mean --

15:50:48  23            MS. TAYLOR:  This is fine with me.

15:50:54  24            MR. CRAIG:  I know you had to wait all

15:50:56  25   day, Mr. Hernandez.  I apologize for that.  We just --

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                BROWNSVILLE DIVISION

 3   JUAN ZAMORA AND           )(
     HERALIO HERNANDEZ,        )(
 4         Plaintiffs          )(
                               )(
 5   VS.                       )(   CASE NO.: B-01-193
                               )(
 6   DANKA OFFICE IMAGING, INC. )(
     AND BRENT LONGCOR,        )(
 7   INDIVIDUALLY AND AS AGENT )(
     OF DANKA OFFICE IMAGING,  )(
 8   INC.,                     )(
           Defendants          )(
 9
                REPORTER'S CERTIFICATE
10
             I, CORINNA N. GARCIA, Certified Court
11   Reporter, certify that the witness, HERALIO HERNANDEZ,
     was duly sworn by me, and that the deposition is a true
12   and correct record of the testimony given by the
     witness on SEPTEMBER 25, 2002; that the deposition was
13   reported by me in stenograph and was subsequently
     transcribed under my supervision.
14           I FURTHER CERTIFY that I am not a
     relative, employee, attorney or counsel of any of the
15   parties, nor a relative or employee of such attorney or
     counsel, nor am I financially interested in the action.
16           WITNESS MY HAND on this the 23rd day of
     January          , 2003.
17

18                           CORINNA N. GARCIA, CSR NO. 5210
                             Expiration Date: 12/31/03
19                           Bryant & Stingley, Inc.
                             2010 East Harrison
20                           Harlingen, Texas  78550
                             (956) 428-0755
21

22

23

24

25
```

1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

JUAN ZAMORA and          ) (

HERALIO HERNANDEZ        ) (

      Plaintiffs       ) (

                  ) (

VS.                      ) (   CIVIL ACTION NO. B-01-193

                  ) (        JURY DEMANDED

DANKA OFFICE IMAGING, INC.) (

and BRENT LONGCOR,       ) (

SUPERVISOR, INDIVIDUALLY ) (

and IN HIS OFFICIAL      ) (

CAPACITY and AS AGENT OF ) (

DANKA OFFICE IMAGING, INC.) (

      Defendants        ) (

_____

ORAL DEPOSITION OF

HERALIO HERNANDEZ, JR.

FEBRUARY 11, 2003

_____

      ORAL DEPOSITION OF HERALIO HERNANDEZ, JR.,
produced as a witness at the instance of the DEFENDANT
BRENT LONGCOR, taken in the above styled and numbered
cause on FEBRUARY 11, 2003, reported by DONNA McCOWN,
Certified Court Reporter No. 6625, in and for the State
of Texas, at the offices of Hole & Alvarez, L.L.P.,
Water Tower Centre, 612 West Nolana, Suite 370,
McAllen, Texas, pursuant to the Federal Rules of Civil
Procedure.



EXHIBIT

3

18

1      A.   Okay.  On about the last week of July 2000.

2      Q.   In July 2000, is what you --

3      A.   Right, right.  About the first week of August,

4   you know.  I don't have an exact date, but --

5      Q.   Okay.  And before you started with Danka, had

6   you been employed somewhere, or were you out of --

7      A.   I was employed somewhere.

8      Q.   -- work?  Where was it that you were employed?

9      A.   Marketing Specialist Corporation.

10     Q.   Okay.  And what was it that caused you to leave

11  that employment to go work for Danka?

12     A.   Well, I was doing great with that company, but,

13  you know, the duties were changing constantly.  They

14  were going into more of a -- going out of town to

15  Laredo and Del Rio.  And, you know, I didn't see myself

16  growing in that role, so I thought, let me look for

17  something else.

18           And that's what -- when I bumped into the

19  ad from Danka, and I said, you know, I got out with,

20  you know, two weeks' notice or with notice and went,

21  you know, to Danka.

22     Q.   And aside from the fact that you felt that the

23  position you had before Danka was one that was growing

24  and you were being asked to travel, was there any other

25  reason for leaving that employment?

20

1    there was not a lot we could do, just hang in there

2    and, you know, basically, I did my job, and they didn't

3    have any problems with them.

4              When I got, you know, in the ads there and

5    I saw Danka, I gave my week's notice or two weeks'

6    notice and got out on good terms.

7         Q.  And you quit.  You weren't fired?

8         A.  No, I was never fired.  I quit.

9         Q.  Okay.  And so was there any kind of time gap

10   between when you left that employment and when you

11   started with Danka?

12        A.  No.

13        Q.  Not even a few days?  Just you went --

14        A.  No.  It was over the weekend.  I quit on a

15   Friday and started Monday.

16        Q.  Okay.  When you first contacted Danka to seek

17   employment with them, who did you contact?

18        A.  Well, Brent Longcor contacted me.

19        Q.  Well, he contacted you?

20        A.  Yeah.

21        Q.  How did he know to contact you?

22        A.  Because, I guess, I turned in my resume.

23        Q.  Okay.  So you turned in a resume?

24        A.  Yeah, right, for the ad.

25        Q.  And who was it that you interviewed with?

21

1       A.  Brent.

2       Q.  Okay.  Do you recall any details of that

3    interview?

4       A.  It went fine.  I mean, he was -- you know,

5    interviewed me fine.  There was no -- nothing that I

6    saw, like, I don't want to work with this guy.  No,

7    everything went fine.

8       Q.  Okay.  When you interviewed with him, did you

9    interview with just him, or was there anybody else?

10      A.  Just him.

11      Q.  Mr. Hernandez, sometimes you're answering my

12   question before I've completely finished it --

13      A.  Okay.  I'm sorry.

14      Q.  -- and you need to let me -- speak only one at

15   a time, because when you're talking and I'm talking,

16   it's very difficult for the court reporter, and the

17   transcript later will be very difficult to understand.

18   So if you would, let me finish the question before you

19   answer.  Okay?

20              So as far as you can recall, when you

21   interviewed with Danka, you interviewed with

22   Mr. Longcor and just him alone; is that correct?

23      A.  Yes.

24      Q.  Okay.  At the time of the interview, did

25   Mr. Longcor give you any indication of whether or not

24

1    start working?

2        A.  I'm trying to recall.  Let's see.  It happened,

3    like, in the -- let's say he notified me, like, on a

4    Thursday, I think.  And that gave me a week to tell my

5    other company about it.  So I would say from that

6    Thursday to next -- that following week I started --

7    not on that Monday, but the next Monday.

8        Q.  So you had the Thursday, Friday, and then a

9    full week?

10       A.  Right.

11       Q.  Okay.  When you first started working with

12   Danka, were you in Harlingen, or did you first start

13   out going off to the training in Atlanta?

14       A.  We first went to Corpus for a couple of weeks.

15       Q.  Okay.

16       A.  And then after that, we went Atlanta.

17       Q.  Okay.  And then after Atlanta, you came to

18   Harlingen and were out of Harlingen the whole time you

19   were employed, correct?

20       A.  Right.

21       Q.  During, say, that first month, more or less,

22   from when you first started, whatever date that may

23   have been, to, say, you know, a month from there, were

24   there any issues that came up that you felt were of

25   concern in the way in which Mr. Longcor supervised you?

25

1    A.   During working hours or --

2    Q.   At any point in time.

3    A.   There was -- at first I'm going to be -- at

4    first I felt kind of lucky because, you know, it was

5    very organized, right, but I had some questions.  We

6    had a party in his house.  Right?  And during that

7    party, I guess, you know, everybody, you know,

8    everybody was drinking, and I don't know.  I just

9    questioned his behavior during that party, you know.

10              It was, like, at his house, right?  And

11    we're new guys there, so we didn't want to just -- we

12    didn't want to drink.  We just wanted to drink a beer

13    or two.  But I did -- I saw some things that I

14    questioned it, but I go, Well, it's just a party.  I

15    shouldn't be so, you know, critical or, you know it's a

16    party, right?

17              But maybe I should have questioned him

18    back then.  Maybe I should have thought about it.  But,

19    you know, I need a job.  Basically, you just want to

20    continue forward, you know.

21    Q.   Well, first of all, do you recall when it was

22    that that party took place?

23    A.   Before we went to Atlanta.

24    Q.   Okay.  And can you tell me the names of other

25    people that were there at that party?

26

```
 1        A.   Let's see.  I know there was a Randy from
 2   Corpus.  There was Yvonne from Corpus.  You know,
 3   basically -- Felicia was there.  I know that Johnny was
 4   there.  And I know Tony Gonzalez was there.  And right
 5   off the top of head, that's who I can recall.
 6        Q.   Okay.  And tell me what it is that you saw
 7   or --
 8        A.   Exactly how I saw?
 9        Q.   Yes, sir.
10        A.   Well, you know, what I questioned, it was,
11   like, he was, you know, a good host, but then as he
12   started getting wilder, you know, he would be -- his
13   bad words were getting out, and then he would grab his
14   nipples and say, "Come on.  Bend over, Bitch," stuff
15   like that.
16             You know, you're trying to just, you
17   know -- you wonder about if that's on a manager part,
18   you know, point of view to do that in front of
19   employees, and a lot of cussing, a lot of -- not only
20   the cussing part, but the way -- the sexual innuendos
21   and "Bend over," and grabbing his nipples and doing
22   this, and, you know.
23             I mean, I questioned it, but, again, you
24   need a job, so you just kind of try, and, you know,
25   maybe you kind of ask yourself, maybe it's a party and
```

33

1    So you think it was about 10:00 or 11:00 maybe, towards

2    the end of the party.  Everybody was kind of leaving

3    already.  And you said "the girls."  What girls are you

4    talking about?

5        A.  I remember it was Yvonne and Felicia, that they

6    were leaving.

7        Q.  Okay.  And you were walking them out?

8        A.  Well, no, not me.  I mean, like, we're -- I

9    mean, everybody was walking toward that, you know, the

10   front of the door.  Right?  So there was, like, a hall,

11   right, or --

12       Q.  Were Yvonne and Felicia one of the first to

13   leave, or other people had already left?

14       A.  I can't recall that.  I really don't recall

15   that.  I mean, I don't even remember who stayed there

16   behind, right?

17       Q.  About how many people altogether were at that

18   party that night?

19       A.  I would say 10 or 12.

20       Q.  10 or 12 altogether?

21       A.  Altogether.

22       Q.  Were all of them Danka employees?

23       A.  Yes.

24       Q.  Okay.  As far as you know, there was nobody

25   else there that was present that was not a Danka

1        A.    Yes, I think so.

2        Q.    Okay.  All right.  And you've got your back to

3    Johnny Zamora, correct?

4        A.    Right.

5        Q.    And you've got your back to Brent Longcor,

6    correct?

7        A.    Right.

8        Q.    Okay.  And the first thing that kind of caught

9    your attention was that you heard a noise?

10       A.    Right.

11       Q.    Okay.  When you turned around, Mr. Longcor was

12   on the floor?

13       A.    He was -- I think he -- he was on the floor or

14   barely, like, hitting the floor or something like that.

15       Q.    Okay.  Mr. Zamora was standing or on the floor

16   or kneeling or what?

17       A.    No.  Mr. Zamora, I think he was standing up

18   and, you know, kind of trying to, you know, get him up.

19       Q.    Okay.  Okay.  I can see you doing your hand

20   gestures, but taking down hand gestures will not be on

21   the record.  So let me try and -- okay.  Mr. Longcor

22   was either about to hit the floor or on the floor

23   already?

24       A.    Right.

25       Q.    And you're indicating with both of your hands

38

1     you know -- he was, I guess, from him getting hurt, you

2     know, because he kind of fell kind of heavy.

3         Q.   Sure.

4         A.   Like, he was, like, you know, "Hey, don't fall

5     down."  Right?

6         Q.   Okay.  So Mr. Zamora would have been, like,

7     bending over helping Mr. Longcor --

8         A.   Right.

9         Q.   -- get up if Mr. Longcor was already on the

10    floor or about to hit the floor?

11        A.   Right.

12        Q.   Okay.  And then you indicated that Mr. Longcor,

13    in some manner, attempted to -- I think you said touch

14    or grab Mr. Zamora?

15        A.   Right.

16        Q.   Can you describe that for me as best you can?

17        A.   Well, as what I recall, when I heard the noise,

18    I turned around quickly and saw his hand on his back

19    grabbing him.

20        Q.   So --

21        A.   But real quickly.

22        Q.   Okay.  Just a second.  When you said "his

23    hand," you're talking Mr. Longcor's hand --

24        A.   Longcor's hand, right.

25        Q.   -- on Mr. Zamora's -- .

39

1      A.   Right.

2      Q.    -- back?

3      A.   No, no.  On his butt.

4      Q.   On his butt?

5      A.   Right.

6      Q.   Okay.  On his butt.  Okay.  Now, were you --

7   when you turned around, were you looking at them, their

8   faces, their front, or their backs?

9      A.   I saw their fronts.

10      Q.   Okay.  And so Mr. Longcor's hand would have

11   been behind Mr. Zamora --

12      A.   Right.

13      Q.    -- away from your vision, right?

14      A.   Well, he was -- I couldn't see the back, but I

15   saw, like, his, you know, motion.  And I saw, you know,

16   just kind of, like, what happened, like.

17      Q.   Well, okay.  Let's see if we have this

18   straight, Mr. Hernandez.

19      A.   Okay.

20      Q.   You've been -- you were with your back to both

21   Mr. Longcor and Mr. Zamora?

22      A.   Right.

23      Q.   You hear the noise.  You turn around.  When you

24   turn around, you were facing them -- their front?

25      A.   Right.  Their front.

1    of like, you know, you know, if I -- even though if --

2    I'm face-to-face right now.  If somebody would grab

3    you, I would say you -- kind of like, you know.  And

4    you would assume, as myself, like -- and you did kind

5    of like -- you kind of would know that something

6    happened.

7                    Now, I saw the -- not exactly the

8    hand-grabbing, but I saw where Johnny jumped and, you

9    know, took his hand away, right?

10        Q.  Okay.  So you saw Mr. Zamora's reaction?

11        A.  Right.  And where he -- the reaction plus where

12    he was --

13        Q.  Kind of --

14        A.  -- you know, grabbing.

15        Q.  Okay.

16        A.  Right.

17        Q.  Okay.  All right.  And you're really not able

18    to tell us, though, whether it was Mr. Longcor kind of

19    grabbing in an attempt to stop himself from falling or

20    what Mr. Longcor's --

21        A.  Well, no, because --

22        Q.  -- purpose was, correct?

23        A.  I would say when I saw that, my first reaction

24    was, Well, he fell down, you know.  Help him up.

25    Right?  But when I saw that, I think what he was doing

44

 1    was not trying to get up.  That's my -- I mean, my

 2    opinion, right?

 3        Q.  Sure.  But I think you've also already told us

 4    that you really can't say whether Mr. Longcor had

 5    already hit the ground or was in the process of hitting

 6    the ground.

 7        A.  Right.  I don't recall that.

 8        Q.  Okay.  So it's very possible, Mr. Hernandez,

 9    that Mr. Longcor was trying to stop himself from

10    falling and grabbed onto the first thing he could,

11    which, unfortunately, happened to be Mr. Zamora.

12        A.  Well, it's possible that -- what you're saying.

13    But it's also possible that what I saw is, he -- was

14    not that.  It was not like, you know, he was trying to

15    hold on.

16              I mean, he was -- it was something, like,

17    I heard the noise, turned around, you know, and I saw

18    that hand, and I saw Johnny's reaction to that --

19        Q.  Sure.

20        A.  -- you know.  You can assume a lot of things.

21        Q.  Sure.  And Mr. Hernandez, would you agree with

22    me that regardless of the circumstances, if anybody

23    touches you in a way that you don't find comfortable,

24    even if -- sometimes when it's accidental --

25        A.  Right.

1    the previous job because you didn't like the changes

2    that were going on there?

3        A.  Right, but I have never been in a situation

4    like that, in other words, to quit like that.

5        Q.  Well, would you agree with me that you believed

6    the situation you were in with Danka was worse than the

7    situation you had been in with your previous

8    employment?

9        A.  Well, yeah, differently.  I mean, you know, my

10   previous employer, regardless of -- if they had

11   anything -- they always treated me with respect, and it

12   was a different type of behavior, you know.

13       Q.  As far as the -- what you've described for me,

14   then, you know, is it your position that that kind of,

15   you know, from within the first month or so being down

16   here in the Valley until the time that the offices down

17   here were closed, was the work environment with Danka?

18       A.  Right.

19       Q.  Okay.  Now, at some point in time Mr. Zamora

20   initiated a complaint through the Danka hierarchy,

21   correct?

22       A.  Yes.  I remember that there was a conference on

23   sexual harassment and what they couldn't do, you know,

24   any employee seeing any type of behavior that there was

25   Human Resources if you had -- or talking to your sales

69

1    manager, and the sales manager would, you know --

2    they're trying to, I guess, teach us about things about

3    harassment, right?

4              Johnny had some questions about it, and

5    when he put that complaint to Human Resources, then

6    that's when they started investigating me, myself,

7    Tony, and everybody --

8    Q.   Okay.  And at that point in time then, you let

9    them know all the complaints that you had against

10   Mr. Longcor, correct?

11   A.   Well, I had not put the complaints.  Johnny

12   had.  They asked me if Johnny's complaint was accurate,

13   and I told them what I had witnessed, yes, you know.

14   But that -- and they told me why I didn't open my mouth

15   before because they, you know -- I thought -- what I've

16   seen in other companies that when you open your mouth,

17   you get eliminated real soon right after that.

18             And he goes -- she goes, "No, not with

19   Danka.  We don't believe in tolerating that type of

20   behavior."  Fine.

21   Q.   But they gave you the opportunity to voice all

22   the complaints that you had about Mr. Longcor, correct?

23   A.   That -- I mean, yes, they told me the, you

24   know, the type of behavior that he would give us, and

25   we told them the truth.

70

1      Q.  Okay.  And you gave them all the information

2  you had at the time, correct?

3      A.  As far as what she asked me, yes.

4      Q.  Well, but they also gave you the opportunity --

5  aside from just answering their questions, they gave

6  you the opportunity to voice any other complaints you

7  might have about Mr. Longcor, correct?

8      A.  Yes.  I mean, you know, basically they asked

9  me -- they did tell me, but they did the questioning

10  themselves.  They told me, you know, "He said this

11  comment, greedy Mexican."

12          I told them yes, and that's about it.

13      Q.  Well, and that's it?

14      A.  Well, you know, I answered their question to

15  whatever they wanted, you know, if they --

16      Q.  Well, now, they didn't tell you what they

17  wanted.  They asked you questions, correct?

18      A.  Right, right.

19      Q.  Okay.  And aside from asking you specific

20  questions regarding specific statements, they also gave

21  you the opportunity to voice any other complaints you

22  had about Mr. Longcor, correct?

23      A.  Yes, yes.

24      Q.  And you did that, correct?

25      A.  Yes.

71

1     Q.  Okay.  And you have already told me that pretty

2     much from, you know, say, late September through the

3     end of your time with Danka that you had been, you

4     know, living in this, you know, hostile work

5     environment, correct?

6     A.  Right, right, right.

7     Q.  So when Mr. Zamora initiates the complaint and

8     Danka comes to you to ask you, you know, "Tell me

9     what's going on," you gave them all the information you

10    had because you were -- first of all, wanted to

11    truthfully answer all their questions, correct?

12    A.  That's one.

13    Q.  Okay.  And then second of all, you didn't like

14    what was going on yourself, correct?

15    A.  Yeah.  I wanted to quit.

16    Q.  And you -- or you wanted that to stop, correct?

17    A.  Exactly.  I preferred it to stop.

18    Q.  Sure.  Sure.  And so you knew that the only way

19    that Danka could do anything about it was if you gave

20    them all information you had, correct?

21    A.  And I told them at that point everything that I

22    can recall at that point.  Yes, that was it.

23    Q.  And in fact, after that time, Danka terminated

24    Mr. Longcor, moved him out of Harlingen and you never

25    had any more dealings with him, correct?

74

1    in which he supervised you would have come from Danka

2    rather than from you personally, correct?

3        A.  Yes, probably so.  The reason I never did, and

4    I'm just saying this, is because you would see him

5    there and the times you'd try to tell him something, he

6    would say, "No, no, wait."

7            You know, and he would -- he would not let

8    you talk, so you were, like, what is there, you know,

9    to say.  Right?  I mean, just weather it out until

10   maybe something stops.

11       Q.  Okay.  Let me show you, Mr. Hernandez, what I

12   have marked as Hernandez Exhibit No. 2.

13           MS. ALVAREZ:  And, Jim, just for your

14   benefit, this is his -- Mr. Hernandez's handwritten

15   notation dated 3-21-01.

16           MR. CRAIG:  Great.

17       Q.  I ask you if you recognize it, Mr. Hernandez.

18       A.  That's mine.

19       Q.  Okay.  And that's your handwriting, correct?

20       A.  Yes.

21       Q.  And it bears your signature at the bottom,

22   correct?

23       A.  Yes.

24       Q.  And now the date on the top of that page is

25   3-21-01.  Would that have been the date that you wrote

96

1    you know, got together and just ate breakfast and went

2    to the employment office and reported for, you know,

3    whatever we could get as far as unemployment.

4              But I don't recall, I mean, sitting down

5    for a meeting or something.  But I told them that this,

6    to me, my own, I mean, I was going to at least report

7    it to the EEOC.  I mean, it seems that when you're in

8    my shoes, it's unfair that for this behavior you lose

9    your job, I mean --

10    Q.  Well, did Mr. Zamora let you know that he had

11    already reported to the EEOC?

12    A.  I don't recall that, ma'am.

13    Q.  Did he basically encourage you to go over and

14    talk to the EEOC?

15    A.  No, he never did encourage me.  I mean, I was

16    pretty upset myself.

17    Q.  Okay.  Let me show you what I have marked

18    Exhibit No. 3.

19              MS. ALVAREZ:  Jim, that's his complaint to

20    the EEOC.

21              THE WITNESS:  Yes, that's mine.

22    Q.  Do you recognize that document?

23    A.  Yes.  I mean, I don't recall the document, but

24    I -- because I -- this was something of an -- I don't

25    recall this document itself.  Okay?  But I recall, you

97

1   know, that's my signature.

2       Q.  Okay.  So that is your signature down at the

3   bottom of that document, correct?

4       A.  Right.

5       Q.  Okay.  And in the box where your signature

6   appears, it says, "I declare under penalty of perjury

7   that the foregoing is true and correct."  Yes?

8       A.  Yes.

9       Q.  Okay.  And you did sign this and declare under

10  penalty of perjury that the foregoing was true and

11  correct, right?

12      A.  Right.

13      Q.  Okay.  And you understood this was a complaint

14  that you were making to the Equal Employment

15  Opportunity Commission where you were alleging

16  discrimination against Danka, correct?

17      A.  Right.

18      Q.  Okay.  And was this statement true and correct?

19      A.  That -- yes.  I mean, you know, that happened.

20      Q.  Okay.  So what you've got in here is true,

21  correct, and you understood that if it wasn't true and

22  correct and you signed it that you were subject to

23  perjury?

24      A.  Right.

25      Q.  Okay.  And if we look at the complaint,

112

1    Mr. Zamora's posterior?

2         A.   Right.

3         Q.   Okay.   Where were you in relation to

4    Mr. Longcor and Mr. Zamora?

5         A.   I was walking, like, in front of them.

6         Q.   Walking in front of them?

7         A.   Right.   I was in the front, right.

8         Q.   Okay.   You were walking out the door?

9         A.   Right, right.

10        Q.   Okay.   What prompted you to turn around and

11   look in the direction of Mr. Zamora and Mr. Longcor?

12        A.   I heard, like, a chair kind of a squeak, you

13   know, when it's falling down, like the floor

14   screeching.

15        Q.   Right.

16        A.   And I just kind of, you know, turned around and

17   see what -- you know, like real quickly.   And what I

18   can recall is, I saw that, and I saw Johnny hitting

19   his -- like, his hand off.

20        Q.   Were you already out the door?

21        A.   No, no.   I was still inside.

22        Q.   Still inside.   Where was Mr. Gonzalez at that

23   point?

24        A.   Mr. Gonzalez?   I don't recall that, sir.   I

25   mean -- I mean, it's been a couple of years, so I don't

113

1    recall where Mr. Gonzalez was.

2        Q.  In fact, you were headed out to Mr. Gonzalez's

3    car to leave the party, correct?

4        A.  No.  Some girls were walking out first, and I

5    think I was, like, "Hey, okay.  We'll see you

6    tomorrow."  Right?  Something like that, to that

7    effect.  And we stayed there a couple of minutes, like,

8    maybe 20 minutes, if I can recall.

9        Q.  Well, so at the time that this touching took

10   place, you were not on your way out the door to leave

11   the party; is that correct?

12       A.  Not to leave the party that I can recall.  It

13   was not to leave the party, because I remember we

14   stayed there a couple of, you know, maybe some minutes

15   there afterwards when the girls left.

16       Q.  So your answer is, it is correct that you were

17   not leaving the party at that point; is that correct?

18       A.  Right, correct, but I think I was in the -- you

19   know, I was walking with those girls outside.

20       Q.  Who were they?

21       A.  I think it was Yvonne and maybe Felicia.

22       Q.  Do you know if Yvonne or Felicia witnessed the

23   touching of Mr. Zamora by Mr. Longcor?

24       A.  Maybe -- I don't think so because I think, as I

25   recall, they were on their way out.  Okay?

114

1    Q.  To?

2    A.  Out the door.  But I don't recall if they would

3  have.  I think maybe they heard him fall.

4    Q.  Well, did Mr. Zamora make any kind of

5  expression of excitement at the time -- or shock at the

6  time Mr. Longcor touched him?

7    A.  I saw that, shock, a little bit shock.

8    Q.  Did he say anything?

9    A.  No, not nothing.

10    Q.  Did he yell anything to the effect of, "Hey,

11  stop that," or --

12    A.  No, no.

13    Q.  -- anything along those lines?

14    A.  No, he just kind of --

15    Q.  I'm sorry.  Did you say no?

16    A.  No.  He just pushed his hand off.

17    Q.  Okay.

18    A.  Like kind of a quick slap.

19    Q.  Pushed his hand off.

20          With what kind of force did he push

21  Mr. Longcor's hand off?

22    A.  With a quick slap, like a jerk.

23    Q.  At the time he slapped Mr. Longcor, was

24  Mr. Longcor already on the ground?

25    A.  It's hard to say -- to recall that, but he did

118

1      A.   Eventually, when he saw this behavior going on.

2    I mean, he did tell me, you know, like, you know -- I

3    don't know.  He said, "He grabbed me, but, you know, I

4    slapped him away real quickly."  Right?

5      Q.   Mr. Longcor didn't grab you or touch you ever,

6    correct?

7      A.   Never, never.

8      Q.   And as far as you know, he never touched

9    Mr. Zamora again; is that correct?

10     A.   As far as I know, no.  As far as I know.

11     Q.   And as far as you know, he never touched a male

12   employee of Danka other than Mr. Zamora?

13     A.   Exactly.  I mean, that's what I know.  Right?

14     Q.   Okay.  Now, when is the last time you spoke to

15   Mr. Zamora?

16     A.   Maybe a couple of weeks ago.

17     Q.   Did y'all discuss anything having to do with

18   your experiences at Danka?

19     A.   No.  I mean, just -- we were just trying to get

20   representation, you know.  We were talking to some

21   attorney.  That's about it.

22     Q.   Yeah.  Did you discuss anything about getting

23   your stories straight for your deposition?

24     A.   No.

25     Q.   You realize you're under oath?

155

1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                 BROWNSVILLE DIVISION
3   JUAN ZAMORA and           ) (
    HERALIO HERNANDEZ          ) (
4           Plaintiffs         ) (
                               ) (
5   VS.                        ) (  CIVIL ACTION NO. B-01-193
                               ) (       JURY DEMANDED
6   DANKA OFFICE IMAGING, INC.) (
    and BRENT LONGCOR,         ) (
7   SUPERVISOR, INDIVIDUALLY   ) (
    and IN HIS OFFICIAL        ) (
8   CAPACITY and AS AGENT OF   ) (
    DANKA OFFICE IMAGING, INC.) (
9           Defendants         ) (
10                 REPORTER'S CERTIFICATE
11      I, Donna McCown, Certified Court Reporter, certify
    that the witness, HERALIO HERNANDEZ, was duly sworn by
12  me, and that the deposition is a true and correct
    record of the testimony given by the witness on
13  FEBRUARY 11, 2003; that the deposition was reported by
    me in stenograph and was subsequently transcribed under
14  my supervision.
        I FURTHER CERTIFY that I am not a relative,
15  employee, attorney or counsel of any of the parties,
    nor a relative or employee of such attorney or counsel,
16  nor am I financially interested in the action.
                WITNESS MY HAND on this the 26th day of
17  February_____, 2003.
18                      _____Donna McCown_____
                        DONNA McCOWN, CSR NO. 6625
19                      Expiration Date: 12/31/03
                        Bryant & Stingley, Inc.
20                      2010 East Harrison
                        Harlingen, Texas  78550
21
22
23
24
25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| JUAN ZAMORA AND )( | |
| HERALIO HERNANDEZ, )( | |
| Plaintiffs )( | |
| )( | |
| VS. )( | CASE NO.: B-01-193 |
| )( | |
| DANKA OFFICE IMAGING, INC. )( | |
| AND BRENT LONGCOR, )( | |
| INDIVIDUALLY AND AS AGENT )( | |
| OF DANKA OFFICE IMAGING, )( | |
| INC., )( | |
| Defendants )( | |

_____

ORAL DEPOSITION OF
ANTONIO GONZALEZ, III
SEPTEMBER 26, 2002

COPY

_____

ORAL DEPOSITION OF ANTONIO GONZALEZ, III,

produced as a witness at the instance of the DEFENDANT

DANKA OFFICE IMAGING, INC., taken in the above styled

and numbered cause on SEPTEMBER 26, 2002, reported by

CORINNA N. GARCIA, Certified Court Reporter No. 5210,

in and for the State of Texas, at the offices of Bryant

& Stingley, Inc., 2010 East Harrison, Harlingen, Texas,

pursuant to the Texas Rules of Civil Procedure.

EXHIBIT
4

09:11:32 1    A.  No, sir.  No, sir.

09:11:36 2    Q.  I want to jump ahead a little bit.  Do you

09:11:39 3  remember when your employment with Danka ended?

09:11:44 4    A.  Yes.  That was in June.

09:11:52 5    Q.  June of 2001?

09:11:54 6    A.  That is correct.

09:11:56 7    Q.  Are you employed currently, sir?

09:11:59 8    A.  Yes, sir.

09:11:59 9    Q.  How are you employed?

09:12:00 10    A.  I am working for Kinko's.  I'm an account

09:12:08 11  representative for Kinko's down here in the Valley.  I

09:12:11 12  handle all the commercial accounts.

09:12:14 13    Q.  Is that a sales position?

09:12:16 14    A.  That is correct.

09:12:20 15    Q.  Is it a sales position where you do outside

09:12:22 16  sales?

09:12:22 17    A.  Yes, sir.

09:12:26 18    Q.  I think I know what it is, but, just for the

09:12:28 19  record, what sort of services from Kinko's do you sell?

09:12:34 20    A.  As a territory representative, my job is to go

09:12:37 21  out there and -- well, sustain and obtain business from

09:12:49 22  current as well as new customers.

09:12:54 23    Q.  How long have you held that position?

09:12:56 24    A.  Since March of this year.

09:13:06 25    Q.  By the way, I appreciate you being able to

09:27:52  1    A.  That's correct.

09:27:53  2    Q.  And have you ever sued anybody?

09:27:57  3    A.  No, sir.

09:28:03  4    Q.  Now, you didn't file a charge of discrimination

09:28:08  5    against Danka; is that correct?

09:28:08  6    A.  No, sir.

09:28:08  7    Q.  It is correct?

09:28:10  8    A.  That is correct.

09:28:14  9    Q.  Have you ever filed a charge of discrimination

09:28:16  10   against any employer?

09:28:18  11   A.  No, sir.

09:28:25  12   Q.  How would you describe your national origin or

09:28:31  13   heritage?

09:28:33  14   A.  I guess Mexican American.

09:28:57  15   Q.  Let's go to the beginning of your employment

09:29:00  16   with Danka then.  You said you found out about an

09:29:05  17   opportunity at Danka.  I'm not sure if I asked you, and

09:29:08  18   I don't want to repeat, but how did you find out about

09:29:11  19   that opportunity at Danka?

09:29:13  20   A.  Through an internet based web site.

09:29:18  21   Q.  Do you remember what it said?

09:29:22  22   A.  If I remember, it also came out on the State

09:29:25  23   job bank.

09:29:27  24   Q.  And how did you make contact with Danka?

09:29:30  25   A.  There was a phone number there, and it had

09:31:15  1    let's go ahead and meet.  So we met and discussed --

09:31:20  2        Q.  Where did you meet?

09:31:21  3        A.  At the Marriott Hotel, I believe, Courtyard

09:31:24  4    Marriott here in Harlingen.

09:31:28  5        Q.  Did you get an interview there with

09:31:30  6    Mr. Longcor?

09:31:32  7        A.  Yes.

09:31:33  8        Q.  Tell me, in that interview did you see any of

09:31:38  9    the other individuals that -- the names I've mentioned?

09:31:41 10    Were they around that day?

09:31:42 11        A.  No, sir.

09:31:45 12        Q.  Where was the interview conducted?

09:31:47 13        A.  In a hotel room at the Marriott.

09:31:49 14        Q.  All right.  And Mr. Longcor was present?

09:31:57 15        A.  That is correct.

09:31:57 16        Q.  Was anybody else present?

09:31:57 17        A.  No, sir.

09:31:57 18        Q.  Was there anything unusual about the interview

09:31:57 19    at all?

09:31:59 20        A.  No, sir.

09:31:59 21        Q.  Mr. Longcor discussed the position with you?

09:32:02 22        A.  That is correct.

09:32:04 23        Q.  All right.  What did Mr. Longcor say to you

09:32:05 24    about what you could expect if you were hired by Danka?

09:32:10 25        A.  Well, an opportunity to make more money than,

09:44:22 1    Danka's policies on discrimination or harassment?

09:44:25 2        A.   Yes, sir.

09:44:26 3        Q.   When do you think you became familiar with

09:44:29 4    them?

09:44:29 5        A.   It was one of those things that HR did, like a

09:44:32 6    sales -- not like a sales, but I don't know if it was

09:44:37 7    that time of the year or that time period where they go

09:44:40 8    over, where HR just reinforces those policies or just

09:44:47 9    updates some policies and lets their employees know.

09:44:50 10       Q.   Were you familiar that there were policies

09:44:53 11   contained in a handbook or manual about discrimination

09:44:58 12   and harassment?

09:44:59 13       A.   That is correct.

09:45:00 14       Q.   Did you read those?

09:45:00 15       A.   I probably did.

09:45:03 16       Q.   After you had read those and HR had reinforced,

09:45:09 17   as you say, did you have an understanding of what you

09:45:14 18   were supposed to do as a Danka employee if you felt

09:45:14 19   like you had encountered harassment based on your sex

09:45:18 20   or your national origin?

09:45:19 21       A.   Yes, sir.

09:45:21 22       Q.   What were you supposed to do?

09:45:22 23       A.   Call HR.

09:45:23 24       Q.   Did you know how to contact HR at Danka?

09:45:26 25       A.   Yes, sir.

09:45:28 1      Q.  And how did you know how to contact HR at

09:45:30 2  Danka?

09:45:31 3      A.  They provided a phone number.

09:45:35 4      Q.  And you received that information at the

09:45:40 5  beginning of your employment with Danka?

09:45:47 6      A.  I probably did.

09:46:29 7      Q.  Was there -- is it possible that there might

09:46:32 8  have been some other time during your employment that

09:46:37 9  somebody from HR came to either Corpus Christi or came

09:46:41 10 to Harlingen and gave training on harassment?

09:46:44 11     A.  No, sir.

09:46:51 12     Q.  So sitting here today, you think probably it

09:46:53 13 occurred at the beginning of your employment.  Is

09:46:54 14 that --

09:46:55 15     A.  Yeah, looking here at the application for

09:46:58 16 employment, it indicates there some of the -- some of

09:47:02 17 their views on that, which is very similar to just

09:47:06 18 about what every company says in their application.

09:47:11 19     Q.  Mr. Gonzalez, during that training in Corpus

09:47:17 20 Christi -- and we'll just focus on that.

09:47:20 21     A.  Sure.

09:47:20 22     Q.  Was there anything that occurred that was out

09:47:22 23 of the ordinary for you, in terms of the training you

09:47:27 24 received?

09:47:27 25     A.  No, the sales industry was very new to me, so I

09:49:04  1        A.  No, a lot of ups and downs.

09:49:08  2        Q.  Do you remember whether Mr. Longcor had a party

09:49:12  3   or gathering during the Corpus Christi phase of your

09:49:17  4   training?

09:49:17  5        A.  Yes, he had a going away party.

09:49:22  6        Q.  And where did he have that?

09:49:22  7        A.  At his house.

09:49:24  8        Q.  Who was present at that party?

09:49:25  9        A.  All the reps, including the ones from the

09:49:28 10   Valley.

09:49:29 11        Q.  So the existing Corpus Christi reps and the new

09:49:33 12   reps from the Valley?

09:49:34 13        A.  Right.  Not all the reps from the Corpus

09:49:37 14   Christi branch were able to make it, but everybody was

09:49:41 15   invited.

09:49:42 16        Q.  How was the party?

09:49:43 17        A.  Like I said, it was -- it was a party.  I

09:49:48 18   usually didn't go to that type of parties, but, you

09:49:52 19   know, it was --

09:49:53 20        Q.  Why is that?

09:49:53 21        A.  Well, I usually don't go to parties where there

09:49:56 22   is drinking involved or like that.  It's not what I

09:50:00 23   usually go to.

09:50:08 24        Q.  And did you witness at that party Mr. Longcor

09:50:12 25   do anything that you felt was inappropriate?

03/17/2003 13:04 FAX 8132617899    FORD & HARRISON LLP                    ☒034
Case 1:01-cv-00193    Document 33    Filed in TXSD on 03/17/2003    Page 116 of 153

48

09:50:19 1  A. There was one instance that I guess everybody

09:50:23 2 was already -- had a little bit too much to drink.

09:50:26 3  Q. What happened?

09:50:28 4  A. Mr. Longcor made some nonverbal gestures.

09:50:34 5  Q. Do you remember what it was?

09:50:35 6  A. He did this thing with himself.

09:50:39 7  Q. You're gesturing toward your chest.

09:50:42 8  A. Right.  He did something with his hands with

09:50:45 9 his breasts, I guess I should say.  He was making a

09:50:50 10 comment while he was doing this motion.

09:50:52 11  Q. Do you remember what the comment was?

09:50:55 12  A. No.

09:50:58 13  Q. Were you offended by that?

09:50:59 14  A. Yes.

09:51:02 15  Q. Did you tell anybody you were offended by that?

09:51:04 16  A. No, sir.  I think I was the only one not

09:51:15 17 drinking, so a lot of their behaviors and a lot of what

09:51:19 18 they said they probably don't remember, but --

09:51:22 19  Q. Well, who was present when he made that

09:51:24 20 gesture?

09:51:28 21  A. Most -- some of the Corpus reps, all the Valley

09:51:33 22 reps, because we all rode in one car, so we were all

09:51:36 23 there.

09:51:36 24  Q. Did you notice any reaction by anyone else to

09:51:41 25 that gesture that Mr. Longcor made?

09:51:44  1      A.  Everybody basically either avoided it or

09:51:49  2  laughed it off.  I mean, I was still in shock.  I

09:51:54  3  wasn't looking at anybody else.  I was like -- it was a

09:51:58  4  little bit shocking.

09:52:00  5      Q.  Could you tell whether anybody was laughing

09:52:02  6  with the gesture, as opposed to laughing nervously?

09:52:06  7      A.  I couldn't tell.

09:52:07  8      Q.  And you say that you rode -- the Valley reps

09:52:16  9  rode together?

09:52:16 10      A.  (Moving head up and down)

09:52:16 11      Q.  Yes?

09:52:16 12      A.  That's correct.

09:52:16 13      Q.  So it would be you, Mr. Ruiz, Mr. Hernandez,

09:52:20 14  and Mr. Zamora; is that right?

09:52:23 15      A.  That's correct.

09:52:28 16      Q.  Did you see Mr. Longcor touch anybody in any

09:52:34 17  manner during that party?

09:52:38 18      A.  My view of it was I guess he had a certain

09:52:42 19  relationship with some of the reps, they felt

09:52:45 20  comfortable with him hugging them.  He was affectionate

09:52:51 21  to some of the reps, the females.

09:52:54 22      Q.  Okay.

09:52:54 23      A.  So --

09:52:57 24      Q.  Did you see him touch any of the male reps?

09:53:01 25      A.  I don't recall, no.

09:53:03  1      Q.   At any time during the party?

09:53:06  2      A.   They may have bumped, but I don't think it was

09:53:09  3   an overt motion to --

09:53:14  4      Q.   Did you see anybody strike Mr. Longcor?

09:53:19  5      A.   Strike Mr. Longcor?

09:53:20  6      Q.   Hit him.

09:53:20  7      A.   No, he fell down one time.

09:53:23  8      Q.   When?

09:53:25  9      A.   Towards the end of the party.

09:53:26  10     Q.   What happened?

09:53:29  11     A.   He -- I thought he slipped off his chair.

09:53:32  12     Q.   Was he sitting in the chair and fell down?

09:53:35  13     A.   He was sitting on a stool.

09:53:37  14     Q.   And he fell down?

09:53:38  15     A.   That's correct.

09:53:39  16     Q.   Did you see if anybody pushed him?

09:53:41  17     A.   No, sir.

09:53:43  18     Q.   Did you leave with Mr. Zamora and

09:53:45  19   Mr. Hernandez?

09:53:45  20     A.   That is correct.  I drove.

09:53:48  21     Q.   And did you go out the door at the same time?

09:53:52  22     A.   Around the same time.  There was a handful of

09:53:56  23   us.

09:53:56  24     Q.   Do you remember whether you went out the door

09:53:58  25   before or after Mr. Zamora?

09:54:00  1    A.  I believe it was before.

09:54:07  2    Q.  Did you see Mr. Zamora going out the door?

09:54:10  3    A.  No.

09:54:14  4    Q.  When Mr. Zamora got in the car, do you remember

09:54:17  5    anything he said?

09:54:20  6    A.  No.  They were just dazed.

09:54:22  7    Q.  Dazed?

09:54:22  8    A.  Well, they were --

09:54:24  9    Q.  Drunk?

09:54:25 10    A.  They were drunk, yeah.

09:54:27 11    Q.  Did Mr. Zamora say anything to you about having

09:54:30 12    been touched or pushed by Mr. Longcor?

09:54:33 13    A.  No.

09:54:34 14    Q.  Did Mr. Hernandez make any remarks about

09:54:36 15    Mr. Zamora being touched or grabbed by Mr. Longcor?

09:54:41 16    A.  No, sir.

09:54:42 17    Q.  Did anybody make any comments in the car about

09:54:46 18    Mr. Longcor?

09:54:48 19    A.  No, I was still in shock from just everybody's

09:54:53 20    attitude and that incident, those two incidents that we

09:54:57 21    talked about.

09:55:01 22    Q.  And were you also at that point a little bit

09:55:04 23    shocked about being at a party that you didn't

09:55:08 24    ordinarily go to where there was alcohol served and

09:55:12 25    people were drinking?

09:58:52 1     Q. And just to finish it out, did you ever see

09:58:55 2   Mr. Longcor make any kind of sexual advance or sexual

09:59:01 3   suggestion to either Mr. Torres or Mr. Ruiz?

09:59:04 4     A. No, sir.

09:59:07 5     Q. We've been going just a little bit past an

09:59:09 6   hour. Let's just take a short break, okay?

09:59:13 7     A. Okay.

09:59:13 8     Q. We'll get you out of here as soon as you can.

09:59:16 9   You understand, though, that Judge Alvarez might have

09:59:20 10  questions and Ms. Taylor might have questions after

09:59:24 11  that?

09:59:24 12    A. I understand.

09:59:24 13    Q. But we're moving very quickly.

09:59:26 14    A. Thank you.

15       (Brief recess)

10:16:31 16    Q. Mr. Gonzalez, I'm going to hand you what I'm

10:16:34 17  marking as Exhibit 4 for this deposition, and ask you

10:16:39 18  to take a look at it. Are you able to identify the

10:16:57 19  document I've handed you as Exhibit 4?

10:17:00 20    A. Yes, sir.

10:17:00 21    Q. What is Exhibit 4, sir?

10:17:02 22    A. It is my statement of complaint.

10:17:07 23    Q. Statement of complaint. Okay. How did this

10:17:11 24  document come into existence? What were the

10:17:15 25  circumstances?

10:23:15 1    I think I may have misspoken.

2    (Question read by reporter)

10:23:16 3    Q.  Let me rephrase it.  From the questions that

10:23:17 4    this woman was asking you on the telephone, did you

10:23:19 5    feel like she was giving you an opportunity to fully

10:23:22 6    tell what you had experienced in the workplace at

10:23:29 7    Danka?

10:23:29 8    A.  She was allowing me to express myself to her,

10:23:30 9    yes.

10:23:31 10    Q.  Yes.  Thank you.  And did you tell her

10:23:37 11    everything that you remembered about things that you

10:23:41 12    felt were inappropriate in the workplace?

10:23:43 13    A.  Yes.

10:23:49 14    Q.  Now, on Exhibit 4, sir, you list four specific

10:23:53 15    dates and four specific incidents.  Let me first ask

10:24:01 16    you, were there additional comments or incidents that

10:24:04 17    you did not include in Exhibit 4?

10:24:09 18    A.  Yes, sir.

10:24:10 19    Q.  Can you tell me why you didn't include those

10:24:13 20    additional comments?

10:24:14 21    A.  I didn't remember the dates for those.

10:24:20 22    Q.  Well, let's talk about the first one on Exhibit

10:24:23 23    4.  It says, "On November 20, 2000 between the hours of

10:24:28 24    7:30 a.m. and 12:00 p.m., he (colleague) could not sell

10:24:32 25    because of his salt and pepper hair."  Do you remember

10:42:31 1    A.  Uh-huh.  We would just all sit there and he

10:42:34 2  would talk or ask us questions or drill us on customers

10:42:40 3  or --

10:42:44 4    Q.  You said Danka couldn't compete in this area.

10:42:43 5  What did you mean by that?

10:42:49 6    A.  I don't think they were able to compete with

10:42:52 7  the market, as far as lower prices that was in the

10:42:56 8  area, and we lost a lot of deals.

10:43:01 9    Q.  To competitors?

10:43:03 10    A.  Yes.

10:43:04 11    Q.  How did -- did you have any knowledge

10:43:06 12  whatsoever of Danka's financial condition during the

10:43:09 13  time you worked with them?

10:43:15 14    A.  Apparently, from what I saw on the internet.

10:43:16 15    Q.  What did you see on the internet?

10:43:18 16    A.  They were downsizing in their international

10:43:21 17  sectors and some sections of the United States.

10:43:30 18    Q.  Did you ever take a look at their stock price

10:43:34 19  during that time?

10:43:35 20    A.  No, I didn't have any stock interest.  I would

10:43:39 21  hear them discuss it, but it wasn't of interest to me.

10:43:44 22    Q.  Did anyone ever tell you that at one point

10:43:47 23  Danka's stock was as high as $54 a share and then at

10:43:51 24  one point was as low as 23 cents a share?

10:43:55 25    A.  Uh-huh.

10:45:15  1    and nationally?

10:45:16  2        A.   That's correct.

10:45:16  3        Q.   Correct?  So would it surprise you when Danka

10:45:21  4    closed the Harlingen office when it did, from a

10:45:24  5    business perspective?

10:45:26  6        A.   No, but I don't think Danka gave us enough

10:45:32  7    knowledge of it beforehand.  Because after Longcor was

10:45:37  8    reinstated elsewhere, we had no knowledge, no

10:45:42  9    management came down after Mr. Longcor, anything that

10:45:47 10    was coming down from corporate or the company was

10:45:50 11    coming down from, I guess, the mentor from the Corpus

10:45:55 12    branch.

10:45:56 13        Q.   And who was that?

10:45:57 14        A.   I believe it was Yvonne.

10:46:00 15        Q.   So was Yvonne coming to the Harlingen branch?

10:46:03 16        A.   No, sir.

10:46:03 17        Q.   How was she communicating with you?

10:46:05 18        A.   Through phone.  I mean, the area district sales

10:46:11 19    manager, Mr. Longcor's boss, did come as low as Corpus,

10:46:18 20    but he never came down here.

10:46:23 21        Q.   Do you think Danka, even though it knew it was

10:46:27 22    losing money down here, should have hired -- spent more

10:46:30 23    money and hired a branch manager?

10:46:32 24        A.   I believe so.  I mean, all the investment they

10:46:35 25    made to open a branch down here in the area, I would --

10:59:04 1    Q.  Do you know how old Mr. Zamora was at that

10:59:08 2  point?

10:59:08 3    A.  No.  And on top of his age, I think he made

10:59:12 4  reference just to, I guess, his educational level, if I

10:59:15 5  could say that.

10:59:16 6    Q.  Okay.  Do you know if Mr. Longcor is older or

10:59:23 7  younger than Mr. Zamora?

10:59:31 8    A.  I don't know.  I believe he's older.

10:59:36 9    Q.  Do you know if Mr. Zamora was under age 40 at

10:59:42 10  the time Mr. Longcor made that remark?

10:59:44 11    A.  Not that I know of.  I don't know his age.

10:59:51 12    Q.  You say that you knew that Mr. Longcor was

10:59:55 13  removed from the office.  Do you have an understanding

10:59:58 14  of how that came to pass?

11:00:04 15    A.  How that came to pass?  No, it was just after

11:00:09 16  HR took our statements, I guess HR contacted

11:00:11 17  Mr. Turner, and Mr. Turner told him to stop what he was

11:00:18 18  doing and go back to Corpus.

11:00:20 19    Q.  And, like we said earlier, you never saw him

11:00:22 20  again; is that right?

11:00:23 21    A.  That's correct.

11:00:23 22    Q.  So you never had him making these kind of

11:00:25 23  remarks that are included on Exhibit 4 in front of you

11:00:29 24  again?

11:00:29 25    A.  That is correct.

11:00:32 1    Q.  Is your -- is it a reasonable inference from

11:00:35 2    the facts that you know that the complaint caused his

11:00:40 3    removal?

11:00:41 4    A.  I believe so.

11:00:49 5    Q.  When you made the complaint, was it your desire

11:00:52 6    that Mr. Longcor be removed as a resolution to your

11:00:56 7    complaint?

11:00:57 8    A.  I believe it was necessary.  For the morale of

11:01:01 9    the office and my fellow colleagues, I think it was

11:01:05 10   very much necessary.

11:01:08 11   Q.  And that's what happened, right?

11:01:10 12   A.  That is correct.  I would have liked for him

11:01:14 13   either to have been terminated or leave without absence

11:01:19 14   or at least given some sort of reprimand other than

11:01:24 15   just reinstating him to Houston.

11:01:27 16   Q.  Well, do you know whether he did receive a

11:01:29 17   reprimand?

11:01:29 18   A.  That's not that I know of.

11:01:31 19   Q.  Do you know what position he was reinstated to

11:01:34 20   in Houston?

11:01:38 21   A.  I guess he became just a named account rep.

11:01:42 22   Q.  So was his management position taken away?

11:01:45 23   A.  That is correct.

11:01:47 24   Q.  Do you know if there was a period of time when

11:01:48 25   he was actually not working for Danka before he went to

11:01:51  1    Houston?

11:01:52  2        A.  Not that I know of.

11:01:55  3        Q.  If you found out that that actually was what

11:01:59  4    happened, would that be along the lines of the

11:02:02  5    discipline you thought he ought to receive?

11:02:08  6        A.  Well, I mean, if the company felt that that was

11:02:10  7    the appropriate reprimand.  I had nothing to do.  I

11:02:13  8    mean, my complaint was that this stop in our office and

11:02:17  9    what Danka did with regard to him, that was up to

11:02:21 10    Danka.

11:02:27 11        Q.  Now, I took it from some of your earlier

11:02:32 12    comments that Exhibit 4 is not an exhaustive list of

11:02:38 13    the -- anything that you believe was offensive or

11:02:43 14    remarks that were offensive made by Mr. Longcor.  Am I

11:02:46 15    right?

11:02:46 16        A.  That's correct.

11:02:47 17        Q.  All right.  Why did you omit comments from

11:02:57 18    Exhibit 4?

11:03:02 19        A.  Because I thought these were really the ones

11:03:06 20    that stood out to me.  There were some other comments

11:03:12 21    that I didn't include in there.

11:03:15 22        Q.  But you wanted Danka's HR to be aware of the

11:03:19 23    most significant things that were bothering you in the

11:03:23 24    workplace; is that correct?

11:03:24 25        A.  Very much so.

11:03:25 1        Q.  So that's why you chose these incidents?

11:03:29 2             MS. TAYLOR:  Objection.

11:03:29 3        A.  That's correct.

11:03:32 4             MR. CRAIG:  Basis?

11:03:34 5             MS. TAYLOR:  Asked and answered.  You

11:03:35 6   asked him -- most of these questions you asked him

11:03:37 7   initially, and he answered you.

11:03:39 8             MR. CRAIG:  Okay.  I'm sure not trying to

11:03:43 9   change his testimony on it.

11:03:46 10            MS. TAYLOR:  I don't know want your

11:03:46 11  intentions are.

11:03:47 12            MR. CRAIG:  When did I ask that?

11:03:48 13            MS. TAYLOR:  Earlier you asked him why

11:03:50 14  didn't he include other statements, and my

11:03:54 15  understanding is his answer was "I didn't know the

11:03:56 16  exact dates.  These are the dates that I remembered, so

11:03:59 17  these are the ones I included."  Now you're asking him

11:04:01 18  the same thing again.

11:04:03 19            MR. CRAIG:  Okay.  I disagree, but that's

11:04:06 20  fine.  What were the other comments that you omitted?

11:04:17 21       A.  I do remember him saying that if we don't

11:04:20 22  sell -- we, obviously, came to the situation where we

11:04:24 23  weren't selling, we weren't doing very well.  He said

11:04:27 24  that our balls were against the wall.

11:04:31 25       Q.  And had you heard that expression ever before?

11:08:09 1    think were effective.

11:08:10 2        Q.   Were they profane?

11:08:12 3        A.   No.

11:08:12 4        Q.   Were they vulgar?

11:08:13 5        A.   No, some were innuendos he would replace a word

11:08:19 6    with a word that was offensive with another word.

11:08:21 7        Q.   For example, the use of the word "freaking"

11:08:24 8    instead of the F word?

11:08:26 9        A.   You might say that, yes.

11:08:30 10       Q.   Well, remember when I asked you earlier about

11:08:32 11   saying "Our balls are against the wall" and might it be

11:08:36 12   better to say "Our backs are against the wall"?

11:08:39 13       A.   Right.

11:08:39 14       Q.   Would you have preferred him to use the F word

11:08:45 15   or "freaking" when he'd use that word?

11:08:45 16       A.   I would rather him use another statement,

11:08:48 17   period.

11:08:48 18       Q.   Yeah, but if you only were limited to two

11:08:51 19   choices?

11:08:52 20       A.   If he had those two choices, I don't know, I'd

11:08:55 21   rather hear him say the word "freaking," I guess.

11:09:00 22       Q.   And is that an example of the North Texas thing

11:09:02 23   that you were describing earlier?

11:09:03 24       A.   Like I said, he's from there.  I'm gathering

11:09:06 25   from that that's where it comes from.

11:48:28  1      A.   His intentions might have been there.   It just

11:48:30  2   didn't reflect in the way he managed the office.

11:48:34  3      Q.   Okay.   And is there any other knowledge that

11:48:37  4   you have of any complaints or occurrences or incidents

11:48:48  5   between Mr. Longcor and either Johnny Zamora or Heralio

11:48:54  6   Hernandez that we haven't covered here today?

11:48:58  7      A.   No, ma'am.

11:49:00  8      Q.   Okay.   Did you ever observe Mr. Longcor engage

11:49:08  9   in any physical contact with either Johnny Zamora or

11:49:12 10   Heralio Hernandez that you thought was inappropriate or

11:49:15 11   that either one of them commented to you or the way in

11:49:18 12   which they reacted --

11:49:20 13      A.   While I was present --

11:49:21 14      Q.   -- as inappropriate?

11:49:22 15      A.   -- in sales meetings, no.   Obviously, we were

11:49:25 16   more than one person.   He did go out on sales calls

11:49:28 17   with them.   I don't know what transpired there.   I have

11:49:30 18   no idea.   But as far as my understanding or what I saw,

11:49:34 19   no, ma'am.

11:49:34 20      Q.   Okay.   And have you ever heard either Heralio

11:49:38 21   Hernandez or Johnny Zamora discuss, make comment on,

11:49:43 22   complain of, or, you know, refer to any physical

11:49:47 23   contact by Mr. Longcor that they considered to be

11:49:52 24   offensive or inappropriate or out of line or anything

11:49:54 25   like that?

```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                       BROWNSVILLE DIVISION

3    JUAN ZAMORA AND              )(
     HERALIO HERNANDEZ,           )(
4              Plaintiffs         )(
                                  )(
5    VS.                          )(   CASE NO.: B-01-193
                                  )(
6    DANKA OFFICE IMAGING, INC.   )(
     AND BRENT LONGCOR,           )(
7    INDIVIDUALLY AND AS AGENT    )(
     OF DANKA OFFICE IMAGING,     )(
8    INC.,                        )(
               Defendants         )(
9
                       REPORTER'S CERTIFICATE
10
             I, CORINNA N. GARCIA, Certified Court
11   Reporter, certify that the witness, ANTONIO GONZALEZ,
     III, was duly sworn by me, and that the deposition is a
12   true and correct record of the testimony given by the
     witness on SEPTEMBER 26, 2002; that the deposition was
13   reported by me in stenograph and was subsequently
     transcribed under my supervision.
14           I FURTHER CERTIFY that I am not a
     relative, employee, attorney or counsel of any of the
15   parties, nor a relative or employee of such attorney or
     counsel, nor am I financially interested in the action.
16           WITNESS MY HAND on this the 23rd day of
     January              , 2003.
17
18                           CORINNA N. GARCIA, CSR NO. 5210
                             Expiration Date: 12/31/03
19                           Bryant & Stingley, Inc.
                             2010 East Harrison
20                           Harlingen, Texas  78550
                             (956) 428-0755
21

22

23

24

25
```

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ZAMORA,
HERALIO HERNANDEZ,

          Plaintiffs

vs.                                              Case No.:  B-01-193

DANKA OFFICE IMAGING, INC. AND
BRENT LONGCOR, INDIVIDUALLY AND
AS AGENT OF DANKA OFFICE IMAGING,
INC.,

          Defendant.

## DECLARATION OF BOB TURNER

        The undersigned, Bob Turner, under penalty of perjury, hereby declares the
following:

        1.      My name is Bob Turner, and under penalty of perjury, I am giving this

declaration in support of the motion for summary judgment by defendant Danka in the

above case..

        2.      I am currently employed by Danka as a Regional Sales Director.  I am

based in Danka's Austin, Texas facility.  I have been Regional Sales Director or

equivalent position since 1999.  I was Regional Director when Danka employed Plaintiffs

Juan Zamora and Heralio Hernandez

        3.      Danka is in the business of selling, leasing and servicing office automation

equipment, including copiers and facsimile machines.  Danka's headquarters are in St.

Petersburg, Florida.  In Danka operates branch offices in Texas, including a current

Page 1 of 5


Initials

branch in Corpus Christi. As Regional Sales Director, I had responsibility for southern Texas, including Corpus Christi and the Rio Grande Valley.

4.      In the summer of 2000, I participated in the decision by Danka to open a branch office and the Rio Grande Valley area. Specifically, we decided to open this branch in Harlingen, Texas. We assigned a sales manager from the Corpus Christi office, Brent Longcor, to be a branch manager of the new Harlingen branch. This required Mr. Longcor to travel to Harlingen on a weekly to bi-weekly basis and to otherwise run the branch from his office by telephone in Corpus Christi.

5.      Consequently, we directed Mr. Longcor to hire sales representatives to work at the Harlingen branch. Mr. Longcor did so and by August 2000, he had hired four sales representatives, including Messrs. Zamora and Hernandez.

6.      Of course, as a startup branch, the expectations for immediate profit were not that high. However, we did have some basic sales expectations for the Harlingen branch. I directly evaluated the performance of the Harlingen branch through reviewing its profit and loss records maintained by Danka and through my visits to the Harlingen branch

7.      Over the course of fall 2000 and early winter 2001, it was my personal observation of the sales records that the Harlingen branch was performing well below our expectations. I had regular discussions with my supervisor, Jerry Bryson, regarding the lack of performance of the Harlingen branch. At the same time that the Harlingen branch was performing poorly, Danka was in the mode of cost reduction and was closing facilities other places in the United States and in our region due to the Company's poor financial condition of during 2000 and 2001.



Initials

8.    The Harlingen branch, like all other branches, was reviewed for its financial viability on at least a monthly basis without regard to any ongoing employment issues. In or about March 2001, it became clear that we had no choice other than to close the Harlingen branch and cut our losses in the Valley. During the same time that we were reaching this decision, I was advised by Danka's Human Resources Department that one of the sales representatives in the Harlingen branch, Zamora, had made a written complaint of harassment against his supervisor, Longcor.

9.    I was further advised by Human Resources that they had conducted an investigation of Zamora's complaint by interviewing Zamora and the other sales representatives in the Harlingen branch. The investigation determined that Longcor had made inappropriate remarks to these individuals, and, accordingly, I immediately ordered Longcor to return from Harlingen to Corpus Christi and to have no further contact with any of the sales representatives in the Harlingen branch.

10.    Once I had considered the results of the investigation, we terminated Longcor's employment as a sales manager effective April 5, 2001. He never supervised any Danka employees from that point forward

11.    Following Zamora's complaint, I was advised by my supervisor Bryson that we were going to close the Harlingen branch. I never advised Bryson of any complaint of harassment by any Harlingen employees of Danka. In any event, the harassment complaint had absolutely nothing to do with the closing of the Harlingen branch--the branch would have closed due to economic conditions regardless of any complaint.


Initials

12.     . I also understand that Zamora and Hernandez claim that we somehow abandoned the Harlingen branch following our removal of Longcor from the branch due to their complaint.  This is not true.  Despite the branch's failing sales numbers, we continued to try to make sales in the Valley and to work with the sales reps there.  Of course, because of the complaint, Mr. Longcor was no longer available to supervise during regular visits or remotely from Corpus Christi.  During that time, I attempted to supervise the Harlingen reps through telephone and fax contact and from one or two visits.

13.     Despite these efforts, the branch had to be closed.  In early June, 2001, I went to Harlingen and advised the reps of this decision.

**+++THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK+++**


Initials

I HAVE READ MY ENTIRE STATEMENT CAREFULLY AND FULLY UNDERSTAND IT. I HAVE PERSONAL KNOWLEDGE OF THE STATEMENTS IN IT.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on March 13th, 2003.

_____
Signature

TAMPA:168303.1



Initials

# EXHIBIT "C"

**EXHIBIT**

5

*INITIAL*
*COMPLAINT*



Dear Beatrice
March 19, 2001

This is a notice similar to the one I sent to Robyn Roett on March 16, 2001. I believe that Brent Longcor as appointed area sales manager for the Rio Grande Valley has misrepresented Danka by creating confusion among the sales personnel as well as causing an unworkable morale. He consistently spent time degrading and confusing the sales force here in the Rio Grande Valley. I am seeking reparations for the actions of a highly appointed representative of Danka. I feel he has wasted everyone's time, Dankas' as well as the sales force that was established and intended by Danka to expand into this area successfully. He has created an unworkable morale among sales reps with his improper managing techniques that have resulted in non-performance and confusion. He has deviated repetitively from costly company expensed spin selling training methods taught to us in Atlanta, GA and has been the cause of confusion and low performance from this area. The following complaints have been e-mailed to Robyn Roett on the above specified date. I would just like to reiterate myself to you for my own records of reporting these incidents to the proper dept and/ or personnel.

- On November 20, 2000 - Brent Longcor referred to me as salt and pepper hair during the 7:30 – 11:00 a.m. meeting. This was clearly a derogatory statement in reference to my age.

- On December 5, 2000 - Brent Longcor referred to me as a greedy Mexican during the 7:30 – 10:00 a.m. meeting. This was clearly a derogatory statement in reference to my race.

- On January 11, 2001, - Brent Longcor referred to me as Diarrhea of the mouth during the 7:30 – 11:00 a.m. meeting. This was clearly a derogatory statement directed in reference to harassment.

This is a second notice to Danka making the proper personnel and/ or dept. aware of the above mentioned incidents. I feel that Danka has been unduly represented by Brent Longcor and his improper managing techniques have prevented the Rio Grande Valley sales force from reaching their full potential in sales for this company due to low morale. I can assure you in advance that none of the above mentioned incidents were taken out of context. All of the above mentioned incidents were stated in front of other witnesses who are all fully prepared to make written statements, as evidence, of Brent Longcor's improper professionalism towards me and the sales force he should have been properly managing and working with, to create a positive working morale that would have allowed Danka to expand into this area successfully.

Report of incidents to human resources                                    1 of 2

I would very much appreciate you notifying me in writing and or e-mail me so that I may have a document as evidence of reporting these incidents. I would also like to be notified of what course of action will be taken by Danka. I feel Danka should handle this matter swiftly and accordingly. If it is not I will find it necessary to seek outside representation in order to correct the ill willed behavior of a highly appointed representative of your company.

I appreciate your consideration in this matter and timely response so that I may decide on the next course of action. Thank you.

Sincerely,

Johnny Zamora
March 19,2001

Report of incidents to human resources                    2 of 2

Hello Robyn,                                                    march 16,2001

I would like to put a complaint on my sales manger. on November the 20th ,my sales manger called me salt & pepper hair, during the meeting between 7:30 & 11:00, on this date December 5th,he called me greedy mexican , during the meeting between 7:30 & 10:00 and in January the 11th , he called me diarrhea of the mouth , during the meeting between 7:30 & 11:00 . I would like to know what type of action Danka is going to take against this type of behavior . If not ,so I could seek outside legal help.

Thank you
JOHNNY ZAMORA






Zamora
EXHIBIT NO. 6
BRYANT & STINGLEY, INC

March 21, 2001

Johnny Zamora
716 S 23rd Street
Donna TX 78537

Dear Mr. Zamora,

The purpose of this letter is to inform you that we are in receipt of your e-mail communications dated March16, 2001 and March 19, 2001. Please be advised that Danka takes these allegations very seriously and we are currently in the process of investigating these allegations. Once the investigation is complete we will inform you of our findings and any actions that are taken.

We want to reiterate to you the importance of Danka's policy against discrimination as stated in our handbook:

*Danka is firmly committed to providing a work environment free from all forms of unlawful discrimination and harassment. Discrimination or harassment based on age, race, gender, color, religion, national origin, disability, marital status, sexual orientation or any other characteristic protected under federal, state or local laws will not be tolerated, all employees are expected to behave in a respectful and business-like manner toward each other, as well as, with customers and contacts outside of the company.*

You are required to keep the contents of this letter and the matters discussed during the investigation confidential. Any additional information or comments regarding this issue may be brought to Human Resources. You can contact me directly at 615-783-2293.

Sincerely,

Robyn Roett
Human Resources Manager
Central Division

725 Melpark Drive
Nashville, TN 37204
(615) 385-6338
Fax (615) 269-3756



Zamora
EXHIBIT NO. 7
BRYANT & STINGLEY, INC



April 5, 2001

Johnny Zamora                          CERTIFIED MAIL
716 S. 23rd St.                        Z250855012
Donna, TX  78537

Dear Ms. Zamora:

We have concluded our investigation based on the information you had provided us in your complaint.

Please be advised that appropriate measures have been taken to remedy the issues that were brought to our attention during the investigation and ensure that this treatment is not repeated. Our policy, as cited in our handbook, states that "Danka is firmly committed to providing a work environment free from all forms of unlawful discrimination and harassment. Discrimination or harassment based on age, race, gender, color, religion, national origin, disability, marital status, covered veteran status, sexual orientation or any other characteristic protected under federal, state or local laws will not be tolerated. "

Should you have any questions, please feel free to contact me at 972-915-8588.

Sincerely,

Beatrice H. Uhl
Sr. Human Resources Representative

4949 West Royal Lane
Irving, TX 75063
(972) 719-6524
Fax (972) 719-6570

# EXHIBIT "D"



3·21·0φ

**EXHIBIT B5**

I Felo Yvirinf want to express my thoughts on the comments that Brent Sanger told us on several dates. On one occasion he comment greely mexican to a co-worker I was deeply disturb. Secondly he also mention to the same worker salt and pepper hair and dyarhic of the mouth. Many time I feel very uncomfeleble about using the word freaking as a substitute for another word. He is always constantly degrading us humileating and cutling people down. Iff any questions call me at (956) 782 6487.



EXHIBIT NO.



# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 360 A1 1574 |
| ☒ EEOC | |

Texas Commission on Human Rights _____ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Heralio Hernandez   SS# 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 | (956) 782-6487 |

| STREET ADDRESS           CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 1113 S. Tower Rd., Alamo, TX 78516 | 6-2-61 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Danka Office Imaging | Cat D (501 +) | (956) 365-3535 |

| STREET ADDRESS           CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1601 S Sunshine Strip Suite C, Harlingen, TX 78550 | 061 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS           CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 11/15/2000 | 06/05/2001 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

1 From on or around November 15, 2000 to on or around June 5, 2001, I was subjected to unwelcome comments of a sexual nature from a male area manager.

2 From on or around November 15, 2000 to on or around June 5, 2001, I was subjected to unwelcome ethnic slurs from the same area manager, non-Hispanic.

3 In March 2001, I participated in an internal investigation and testified about the sexual and ethnic comments.

4 On June 5, 2001, I was discharged.

5 I believe that I have been discriminated against because of my sex, male, and because of my nation origin, Hispanic, as well as in retaliation for protesting discrimination, all in violation of Title VII of the Civil Rights Act of 1964, as amended.

2001 AUG 30 P 2

Hernandez
EXHIBIT NO. 3
2-11-03

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date  8-28-01   _Charging Party (Signature)_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |

EEOC FORM 5 (Rev. 07/99)

ZAM 00204

# EXHIBIT "E"



EXHIBIT B4

3-21-01

I would like to make known some statements that were said at place of employment during sales meetings. Uncomfortable and offensive statements were addressed to a colleague. The following phrases were stated at this dates and times.

November 20, 2000   between the hours of 7:30 a.m. - 12:00 p.m.
"He (colleague) could not sell because of his salt-n-pepper hair"

December 11, 2000   between the hours of 7:30 a.m. - 12:00 p.m.
"You (colleague) greedy mexican."

January 11, 2000   between the hours of 7:30 a.m. - 11:00 a.m.
"Diarrhea of the mouth"

March 20, 2001   between the hours of 7:30 a.m. - 10:00 a.m.
"He (colleague) is so old he used an habiscus instead of a calculator."

Antonio Gonzalez III    (954) 233-1809

Gonzales
EXHIBIT NO. 4
BRYANT & STINGLEY, INC